*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRIAN J. BENDER and JAMES W. RAFFERTY,
                    *Plaintiffs-Appellants,*

                    *v.*

HECHT'S DEPARTMENT STORES, a division of MAY
ENTERPRISES,

                    *Defendant-Appellee.*

No. 05-5662

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00042—Todd J. Campbell, District Judge.

Argued: April 27, 2006

Decided and Filed: August 1, 2006

Before: KENNEDY, COLE, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** W. Gary Blackburn, BLACKBURN & MCCUNE, Nashville, Tennessee, for
Appellants. Betty Thorne Tierney, THE MAY DEPARTMENT STORES COMPANY, St. Louis,
Missouri, for Appellee. **ON BRIEF:** W. Gary Blackburn, BLACKBURN & MCCUNE, Nashville,
Tennessee, for Appellants. Betty Thorne Tierney, THE MAY DEPARTMENT STORES
COMPANY, St. Louis, Missouri, for Appellee.

---

## OPINION

---

McKEAGUE, Circuit Judge. Brian Bender and James Rafferty (collectively, the "Plaintiffs")
worked for Hecht's Department Stores ("Hecht's") and its predecessor for a number of years. Both
were laid off during a corporate-wide reduction in force in 2003. They sued their former employer,
asserting claims of age discrimination under the Age Discrimination in Employment Act of 1967
(the "ADEA"), 29 U.S.C. §§ 621 *et seq.,* and the Tennessee Human Rights Act (the "THRA"), Tenn.
Code. Ann. §§ 4-21-401 *et seq.* The district court granted summary judgment in favor of Hecht's.

On appeal, the Plaintiffs argue that they have met their evidentiary burden to warrant a trial.
We disagree. As explained below, the Plaintiffs have failed to establish their *prima facie* case that
their positions were eliminated as a result of age discrimination. Moreover, they have not shown

1

that Hecht's proffered rationale for selecting others for two open positions was pretextual. Accordingly, we affirm summary judgment in favor of Hecht's.

## I.

### A.    *Corporate Structure*

Hecht's is a division of The May Department Stores Company ("The May Stores"). Hecht's operates a number of department stores across the East Coast and Tennessee. The division is itself divided into six regions. Each region has a Regional Vice President ("RVP"). The six RVPs report to Hecht's Senior Vice-President of Stores, Paul Proietto. In turn, each department store has a General Manager ("GM"), and, depending on sales volume, one or more Divisional Sales Managers ("DSM")[1] and Area Sales Managers ("ASM").[2] GMs and DSMs are considered senior executives.

Both Bender (50)[3] and Rafferty (55) were DSMs in different Nashville-area Hecht's stores. There are a total of five stores within the Nashville area. All of these stores are in the same region, along with eight other stores. Andrew Grafton was the RVP for the thirteen-store region in which the Plaintiffs worked.

### B.    *Plan for Workforce Reduction*

As a result of stagnating sales and rising expenses, The May Stores developed a company-wide plan for reducing its workforce. With respect to the DSM position, no Hecht's store with sales under $26m could have a DSM. If low sales forced a reduction in staff at a particular store, and there was only one affected DSM, that position was to be eliminated. If there were two DSMs at a store with sales volume justifying only one, the company would consider terminating an employee with a Marginal or Unacceptable evaluation on the employee's "Annual Performance Appraisals."[4] If employees could not be differentiated by their appraisals, then the company would look to their seniority status, with employees with the least seniority being the most vulnerable. After determining which positions to eliminate, the company would then fill any existing open positions with employees whose positions were to be eliminated.[5]

Several weeks before the workforce reduction occurred, Tim Logan, Vice President – Compensation, Benefits, HRIS for The May Stores, sent an email to Kathy Gentilozzi, Vice President of Corporate Human Resources for The May Stores. In it, he clarified that not everyone rated Marginal or Unacceptable had to be separated. "A solid performer over many years who happened to have weaker than normal results LY may not be an appropriate candidate for

---

[1]DSM duties include: "initiating strategies to achieve sales goals, analyzing merchandise needs, developing . . . staff, and contributing to storewide merchandising and management decisions," as well as developing and supervising "several Area Sales Managers within the store."

[2]ASM duties include: "supervising a multimillion dollar merchandise zone – driving sales, managing selling floor activities, presenting and managing merchandise, and supervising . . . department's sales staff."

[3]The number in parenthesis represents the age of the employee at the time of the workforce reduction.

[4]The other possible evaluations were "Outstanding," "Very Good," and "Effective."

[5]Other positions were subject to different criteria. For example, the new standard for ASMs was six positions for a store with $15m in sales; seven positions for a store with $16m-$18m in sales; eight positions for a store with $19m-$21m in sales; and so forth.

separation." He further explained that an employee's "EDR 'Capacity for Development' cannot be a factor in determining who is to be separated."[6]

## C.     *Implementation of the Workforce Reduction Plan*

Grafton made recommendations regarding eliminations and transfers within his region. He received assistance from Pat Wright, Vice President, Director, Stores Human Resources. Proietto and Hecht's Senior Vice President of Human Resources, Bruce Kelso, made the final recommendations for the entire Hecht's division. Gentilozzi made the final decision on all terminations and transfers across The May Stores.

When discussing the workforce reduction, there are four distinct levels of organization to which the parties refer: The May Stores as a whole; the Hecht's division; Grafton's region; and the Nashville-area Hecht's stores.

**The May Stores as a Whole:** The May Stores implemented its workforce reduction plan in June 2003. 1,450 employees lost their jobs.

**The Hecht's Division:** In total, 143 executives were terminated within the Hecht's division. Thirty five DSM positions were eliminated (thirteen of the affected DSMs were transferred or demoted, and twenty two were terminated). Of the thirteen who were transferred or demoted, six were under the age of 40. Of the twenty two who were terminated, thirteen were under the age of 40. The average age of those DSMs impacted by the reduction was 40.8 years, slightly less than the overall age of the DSMs before the reduction (41.1 years).

**Grafton's Region of Hecht's Stores:** Within Grafton's region, one GM was terminated. From the region's group of DSMs (before the reduction), three were selected to takeover GM positions: Regina Dyer (51) and Terri Gunn-Thomas (41) became GMs outside Grafton's region, and Allen Wesson (30) became a GM within Grafton's region.

At the next step of the reduction, eight DSM positions were eliminated within Grafton's region. Five of those DSMs were terminated or demoted, while three were laterally transferred. Of the thirteen DSMs who were ultimately retained or demoted, six were under the age of 40.

**Nashville-Area Hecht's Stores:** Of the six DSM positions in the Nashville-area stores, four were eliminated. Both Bender's and Rafferty's stores fell far below the $26m-sales threshold. Brenda Woosley's (47) store also fell below the threshold. They were the only DSMs at their respective stores, so their positions were eliminated. Terry Patton's (39) store had two DSMs, but under the new workforce reduction criteria, it qualified for only one. Brian Jones (29) was the other DSM at the store. Because Jones had recently received an Effective appraisal, while Patton received a Marginal one, Patton's position was eliminated. The remaining DSM position – Wesson's position before he was promoted to GM – was not slated for elimination because the sales at the store exceeded $26m.

---

[6]In addition to its annual appraisals, Hecht's had another system for evaluating employees, its "Executive Development Review" (the "EDR") system. The EDR system was designed primarily to identify employees with leadership potential and abilities. There were five categories: (1) Promotable (ready for next available opening); (2) Developable (should be ready for promotion in 12-24 months); (3) Pacesetter (developing as expected and on track, but needs more seasoning); (4) Hold/Other (doing a good job in current placement but not showing signs of moving to the next level); and (5) Needs Attention (executive not performing job function satisfactorily and needs attention).

**D.**        *Opportunity to Transfer*

After determining which DSM positions were to be eliminated, the company looked at the remaining open positions. In the Nashville area, there were two openings at the time of the reduction: the DSM position vacated by Wesson, and an ASM position that had been vacated before the reduction. Because the Nashville-area stores had recently been purchased and converted to Hecht's stores in 2001, the company decided to fill the two positions with the displaced DSMs from the area rather than outside people. Similarly, the company did not consider moving any of the four displaced DSMs to an outside market.

The process of filling the open positions was less structured than the one for eliminating positions. According to Hecht's, the company looked to place employees with the best merchandising skills in the two open positions. It also considered the displaced DSMs' potential for advancement in the company, as measured by their EDR scores, their interactions with fellow employees, and their history of annual appraisals. In short, according to Kelso, the company weighed "all a candidate had to offer, in particular noting their merchandising skills and potential for advancement."

On their recent annual appraisals, Bender, Rafferty, and Woosley were all rated Effective. In 2002, Rafferty had the highest raw score – 65 – among the Nashville-area DSMs. Patton had been rated as Effective in 2001; however, in 2002, he received a raw score of 25, which placed him in the Marginal category. The low rating was due primarily to a large construction project in his store which negatively affected sales, according to Hecht's. On the EDR system, Bender, Rafferty, and Woosley received Hold/Other ratings. Hecht's had earlier rated Patton as a Pacesetter. Yet, because of his lower sales during the construction project, he was moved down to Hold/Other.

Hecht's decided to place Patton in the open DSM position and Woosley in the open ASM position. According to the company, it deemed Patton the best choice for the DSM position for several reasons, including: he was "an accomplished merchant who understood the way Hecht's wanted its floors to look"; "[h]e could implement the plan-o-grams[7] and could explain adequately any deviations he took from them"; and "[h]e also seemed to have a strong rapport with his staff." Furthermore, he had worked at a larger volume store than the other three displaced DSMs. Woosley was purportedly the best choice for ASM because she had prior experience in the position (approximately 16 years), had only recently moved from the ASM to the DSM position, and had shown a willingness to accept, learn, and implement the company's merchandising philosophy and methods.

In contrast, Rafferty opposed Hecht's merchandising philosophy and methodology, especially the plan-o-grams system, according to several of his co-workers and supervisors. Coworkers also testified that Rafferty was difficult to get along with personally. Ultimately, according to the company, it did not make sense for it to retain someone who did not embrace its way of doing business.

As for Bender, he had less experience in merchandising than either Patton or Woosley, having spent most of his time in loss prevention, operations, and human resources before becoming a DSM. Bender admitted that he did not begin to learn merchandising until six months before Hecht's took over his store in 2001. In his most recent appraisals, the company documented several problems that he was having with the company's merchandising system.

---

[7]The "plan-o-grams" system is Hecht's primary merchandising scheme.

Bender and Rafferty take issue with the company's rationale. Regarding the ASM position, the Plaintiffs do not dispute that Woosley was a successful ASM for a number of years before becoming a DSM. They maintain, however, that they both had relevant experience as an ASM. In 2002, Bender filled in for an ASM on maternity leave for approximately six to eight weeks, and sales increased during this period. Rafferty started out his career as an equivalent to an ASM in 1972. They argue that their personnel files document two highly experienced employees capable of being an ASM.

As to the DSM position, both Plaintiffs had extensive experience with Hecht's and its predecessor. Bender had approximately twenty-five years with the retail company. Rafferty had over thirty years experience with the company, and he was a DSM (or its equivalent) for approximately the last eight years. They assert that they understood retail merchandising and did not have problems implementing the plan-o-grams system.

They also point out several issues involving Patton. As recounted above, Patton had received a Marginal evaluation, while both the Plaintiffs earned higher appraisals. In response to Hecht's explanation that Patton's appraisal was lower because of construction in his store, the Plaintiffs note that Jones's appraisal did not take a similar hit, even though the two worked as DSMs in the same store. Hecht's counters that the remodeling affected Patton's side of the store more than Jones's.

Rafferty highlights the fact that in the year before the workforce reduction, he earned the highest appraisal score of any of the area DSMs, including Patton. Kelso testified that the company did not consider raw scores in deciding whether to retain or terminate that employee. Yet, as the Plaintiffs point out, one of the reasons given by Hecht's to Bender in August 2003 for not retaining him was that he had a relatively low Effective rating.

Moreover, the Plaintiffs call into question the reliability of the annual appraisals, noting that Kelso testified that the company "manipulated" the appraisals of some Nashville-area DSMs when the company initially took over the stores. According to him, the company did not want, as one of its first acts in the Nashville stores, to dampen morale by giving out a number of low performance appraisals. Accordingly, it gave out better-than-earned appraisals to some DSMs. Kelso could not identify, however, which particular DSMs benefitted from the score inflation.

## E.        *The New Hecht's Store in Green Hills*

At the time of the workforce reduction, Hecht's had plans to construct a new store in Green Hills, the location where Rafferty had worked. When completed, the new store was expected to have sales exceeding $26m. The new store received its budget in August 2004, and was opened for business in October 2004. Chris Harston, an ASM, was promoted to DSM for the store in August 2004.

**II.**

The Plaintiffs filed their complaint in January 2004, asserting federal and state claims of age discrimination against Hecht's. Upon completion of discovery, Hecht's moved for summary judgment on all claims. The district court granted the motion, concluding that even if the Plaintiffs could meet their *prima facie* burden and produce evidence that the company's stated rationale was simply a pretext, "they ultimately have not shown that the decisions concerning their employment were based upon their age." *Bender v. Hecht's Dep't Stores*, No. 3:04-0042, slip op. at 6 (M.D. Tenn. Feb. 22, 2005).

The Plaintiffs timely appealed.

## III.

We review *de novo* the district court's grant of summary judgment. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004) (citations omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record in this case, we draw all reasonable inferences in favor of the Plaintiffs as the nonmovants. *Rowan*, 360 F.3d at 547 (citation omitted).

### A.          *Age Discrimination in Workforce Reduction Cases*

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). We apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA. *See Johnson v. Collins & Aikman Auto. Interiors, Inc.*, No. 1:02-CV-365, 2004 WL 1854171, at *3 (E.D. Tenn. Feb. 26, 2004) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26 , 31 (Tenn. 1996); *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003)).

The Plaintiffs have conceded that they have no direct evidence of age discrimination. Moreover, there is no question that the Plaintiffs' positions were eliminated as part of The May Stores overall workforce reduction. Thus, to establish their age-discrimination claims, the Plaintiffs must satisfy the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified for workforce-reduction cases. As we recently explained in *Rowan*:

> According to this analysis, plaintiffs first establish a *prima facie* case of age discrimination. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). At that point the burden shifts to the defendant, who must give legitimate, non-discriminatory reasons for the adverse employment decision. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir. 1993) (citing *McDonnell*, 411 U.S. at 802). If they do so, the burden shifts back to the plaintiffs, who must establish that the legitimate reasons offered by the defendant were just a pretext for decisions actually motivated by an unlawful bias against age. *Id*. . . . In order to establish a *prima facie* case of age discrimination, plaintiffs must show (1) that they were members of a protected age class; (2) that they were discharged; (3) that they were qualified for the positions they held; and (4) that they were replaced by a younger worker. *Cox v. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). However, in "reduction in force" cases like this one, the fourth prong is modified so that the plaintiffs must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). If the plaintiffs have made out a *prima facie* case of discrimination, the defendant can be awarded summary judgment only if no reasonable jury could conclude that the reasons offered for the plaintiffs' dismissals were only a pretext hiding a discriminatory motive.

360 F.3d at 547-48.

The Plaintiffs' claims analytically fall into two distinct categories: (1) the elimination of their positions; and (2) the failure to receive an offer to transfer to another position within Hecht's. We address each category separately. *See Ercegovich*, 154 F.3d at 350-51.

**B.       *Elimination of the Plaintiffs' Positions***

On their claim that their positions were eliminated because of their age, Hecht's admits that the Plaintiffs have met the first three factors of their *prima facie* case. The parties disagree, however, on the fourth factor – whether the Plaintiffs were singled out based on their age.

The Plaintiffs rely primarily upon statistical evidence to show that they were singled out. In determining whether there is a question of fact, we must first identify the proper group of employees with which to compare against the Plaintiffs. In other words, in comparison to which group were the Plaintiffs purportedly singled out? Identifying this group is not always a simple task, especially in cases involving a companywide workforce reduction affecting numerous divisions with different decisionmakers.

The Plaintiffs argue that we should look only at the Nashville-area DSMs. This is a relatively small sample, and the Plaintiffs were older than all of the employees whose positions were not designated for elimination. There are, however, no sound reasons for limiting the review group to this small sample. On the other hand, Hecht's suggestion that we should look to all eighty one of its department stores also falls short.

Hecht's used different criteria in determining whether to eliminate DSM positions than it did for other positions (e.g., ASM positions). There were also various decisionmakers looking at different positions across Hecht's and The May Stores. Accordingly, we must insure that any observed disparity in the treatment received by the Plaintiffs versus other employees is not the result of legitimate differences in how the company selected other positions for elimination or how a particular decisionmaker who had no voice in the Plaintiffs' positions made certain recommendations on other positions. In essence, the group must provide a consistent benchmark to gauge whether the Plaintiffs were singled out. *Cf. Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1468 (6th Cir. 1990) ("[W]e cannot say that it is illogical to include all of the employees who could have been considered by the management personnel involved in the decision"); *Segar v. Smith*, 738 F.2d 1249, 1274 (D.C. Cir. 1984) (adopting an "analytic method to ensure that a plaintiff's statistics measure disparities among comparably qualified workers, rather than disparities in qualifications"). Logically, therefore, the relevant group must include: (1) the Plaintiffs' positions; (2) all of the positions slated for elimination that were reviewed by the same decisionmaker(s); and (3) all equivalent, but only the equivalent, positions of those held by the Plaintiffs – i.e., the group consists only of DSMs. The group which satisfies all three conditions will consist of all (but only) DSM positions, including the Plaintiffs', which were actually reviewed for possible elimination by the same decisionmakers.

There were five persons involved in determining whether the Plaintiffs' positions were to be eliminated. Of the five, Grafton had the narrowest scope of responsibility – his region. All of the other decisionmakers had some involvement in reviewing positions outside Grafton's region.

Focusing on Grafton's region, Hecht's presented convincing evidence that it reviewed all DSM positions within the region for possible elimination, and the Plaintiffs have offered no contrary evidence. Thus, this group – DSMs within Grafton's region – satisfies the criteria set out above: (1) it includes the Plaintiffs' positions; (2) the same decisionmakers were involved; and (3) it includes each and every DSM position within Grafton's region.

In focusing on Grafton's region, it becomes clear that Hecht's did not discriminate against the Plaintiffs by slating their positions for elimination. Again, as the Plaintiffs have no direct evidence of discrimination, they must rely on statistical and circumstantial evidence of discrimination to support their *prima facie* case. As for the first type of evidence,

Appropriate statistical data showing an employer's pattern of conduct toward a

protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class. *Laugesen v. Anaconda Co.*, 510 F. 2d 307, 317 (6th Cir. 1975). To do so, the statistics must show a *significant disparity* and eliminate the most common nondiscriminatory explanations for the disparity. *Segar v. Smith*, 738 F.2d 1249, 1274 (D.C.Cir. 1984).

*Barnes*, 896 F.2d at 1466 (emphasis added). Here, the relevant statistical evidence does not show such a disparity:

> • the average age of all the DSMs within Grafton's region just prior to the workforce reduction was 41.7 years;
>
> • the average age of the eight DSMs whose positions were eliminated was 43.4 years; and
>
> • of those eight DSM positions, three were held by persons below 40 years of age, and five were above that age.[8]

The slight difference in average ages in DSMs positions eliminated compared to the pre-elimination DSMs – 1.7 years – is not significant. Nor do these statistics counter the "most obvious explanations" for the position eliminations – i.e., low sales volume at certain stores and lower proficiency among certain DSMs. *See id.* (noting that "the most obvious explanations for the discharge of any one employee are lower proficiency and/or random chance"). The Plaintiffs argue that their statistical evidence creates a genuine issue of material fact, but their evidence is derived solely from the Nashville-area stores, not Grafton's entire region, and therefore has little consequence.

The Plaintiffs likewise offer little in terms of circumstantial evidence. Rafferty argues that his position should not have been eliminated because, at the time of the restructuring, Hecht's had plans for a new store in his area, one with projected sales exceeding the $26m threshold. Yet, the new store was not completed until approximately fifteen months after the workforce reduction. A company is not obligated to retain an employee otherwise subject to a workforce reduction because it expects to have an opening in the not-too-distant, but not immediate, future. If an employer is under no duty to transfer an employee subject to a workforce reduction, *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 374 (6th Cir. 1999), an employer is certainly under no duty to retain an employee until another position opens up.

The Plaintiffs have not shown by statistical or other evidence that they were singled out by Hecht's because of their age. Accordingly, they have not met their *prima facie* burden on their position-elimination claim. Although the district court granted summary judgment on a different ground, we can affirm judgment on a ground other than the one considered by the lower court. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004).

---

[8]Hecht's asserts that Grafton lost five DSMs. This is a net result, determined after positions were eliminated and employees demoted or transferred. The number of DSM *positions* (as opposed to employees) actually eliminated was eight.

**C.**     ***Failure to Transfer***

We now turn to the Plaintiffs' claim that Hecht's discriminated against them by giving the two open positions to Patton and Woosley.  As we explained in *Ercegovich*,

> Although an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination. *See Hawley v. Dresser Indus., Inc.*, 958 F.2d 720, 723 (6th Cir. 1992); *cf. EEOC v. Chrysler Corp.*, 733 F.2d 1183 (6th Cir. 1984).  In other words, a plaintiff denied an opportunity to transfer establishes a *prima facie* case of age discrimination when he or she produces evidence demonstrating that 1) he or she is a member of a protected class; 2) at the time of his or her termination he or she was qualified for other available positions within the corporation; 3) the employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination.

154 F.3d at 351.

Again, the only factor at issue here is the fourth, and, again, the issue of which group to consider is crucial to the Plaintiffs' *prima facie* case.  Hecht's provides uncontroverted evidence that, across the entire Hecht's division as well as Grafton's region, the average age of those DSMs retained rather than terminated did not differ significantly from the average age prior to the workforce reduction.  Moreover, the average age of DSMs across Hecht's actually increased as a result of the workforce reduction, further belying the claim that the company discriminated against its employees based on age.  *See, e.g.*, *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986) (noting that an increase in the average age of similarly situated employees after a workforce reduction "refutes any inference of discriminatory animus on behalf" of the employer).

For purposes of the Plaintiffs' *prima facie* case, however, Hecht's divisional and regional evidence is not controlling.  Under the logic of the three-part criteria set out in the preceding section, we might have started by looking at Grafton's region.  Yet, Hecht's admits that it treated the issue of *employee transfer/demotion* differently than it treated the issue of *position elimination*, at least in the Nashville-area stores.  The company did not consider any outside employees for transfer to the open DSM and ASM positions, just those Nashville-area DSMs whose positions were being eliminated.  Likewise, it did not consider moving any of the affected DSMs to an outside market.  Thus, Bender and Rafferty (like Patton and Woosley) were considered for the open Nashville-area positions, but *only* those positions.  Hecht's itself truncated the group that was eligible for the open positions, and this is the relevant group to consider in analyzing the Plaintiffs' *prima facie* case.

The relevant group is quite small: Woosley, Patton, Rafferty, and Bender.  The Plaintiffs argue that Wesson should also be included in the group.  Yet, the only reason there was an open DSM position in the Nashville-area was because Hecht's promoted Wesson to GM.  Had Wesson remained a DSM, he would not have been terminated under the workforce reduction plan because his store had sales in excess of $26m.  It was his promotion and the resulting DSM opening at a +$26m sales store, in fact, that largely gives the Plaintiffs a colorable claim in the first place, since Hecht's otherwise was under no obligation to create a new DSM position for the Plaintiffs. *Cf. Godfredson*, 173 F.3d at 374.  Thus, Wesson was simply not similarly situated to the Plaintiffs (or

Woosley or Patton, for that matter) vis-à-vis their transfer claim because his DSM position was not subject to elimination under the workforce reduction plan.[9]

Looking only at Woosley, Patton, Rafferty, and Bender, the Plaintiffs have offered sufficient evidence to meet their initial burden. At the time of the reduction, Patton was not a member of the protected class, and he was the only one offered a DSM position. He was also the only one who had a Marginal appraisal rating. The next youngest, Woosley, was offered a demotion to an ASM position. Given that the oldest two members of the group were terminated, the next oldest was demoted, and the youngest was transferred even though he received a lower performance review, the Plaintiffs have met their *prima facie* burden.

Under the next step of the *McDonnell-Douglas* analysis, Hecht's must "articulate some legitimate, nondiscriminatory reason" for offering the positions to Patton and Woosley. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997) (quoting *McDonnell Douglas*, 411 U.S. at 802). If Hecht's meets its burden, then the burden shifts back to the Plaintiffs to show that the proffered reason is a mere pretext masking the company's discriminatory actions. The Plaintiffs can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). At this final stage, "'[t]he burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff.'" *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (quoting *Wilkins v. Eaton Corp.*, 790 F.2d 515, 522 (6th Cir. 1986)).

According to Hecht's, it implemented the workforce reduction with the goal of reducing expenses and retaining the strongest employees. Of the four Nashville-area DSMs whose positions were eliminated, Patton purportedly had the strongest experience and abilities in merchandising, a vital part of the DSM's job. He also embraced the company's plan-o-grams merchandising system, while Bender purportedly did not fully understand the system, and Rafferty disparaged it. As for Woosley, she had been a successful ASM for a number of years prior to being moved up to a DSM. Grafton and the other decisionmakers figured she would be successful in returning to that position.

These certainly qualify as legitimate, nondiscriminatory reasons for the company's actions. The burden thus shifts to the Plaintiffs to present sufficient evidence that the proffered rationale was a pretext for illegal discrimination. The Plaintiffs have no direct evidence of discrimination; thus, they must come forward with sufficient evidence that Hecht's decisions to retain Patton and Woosley were not credible. *See Kline*, 128 F.3d at 342-43. The Plaintiffs must show, in essence, that Hecht's "'business decision' was so lacking in merit as to call into question its genuineness." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (quoting *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).

As to the ASM position, the Plaintiffs have offered no credible evidence that they were as qualified as Woosley. There is no dispute that she had extensive experience as an ASM; in contrast, the Plaintiffs had relatively limited experience in that position. Woosley herself was a member of the protected class, and was not significantly younger than either of the Plaintiffs. Given this, as

---

[9] As to Wesson's promotion to GM, the Plaintiffs have not offered sufficient evidence that he received the promotion in lieu of the Plaintiffs as a result of discriminatory animus. He was, by all accounts, qualified for the position: he was a DSM at one of the largest store in the Nashville area; he received Effective appraisal ratings; and he was deemed by his supervisors to be Developable, the second highest score on the EDR scale. Other than pointing to a single disciplinary action for kissing a co-worker, the Plaintiffs offer no evidence to suggest he was not qualified for the position, or that they were more qualified. Thus, even if the Plaintiffs could establish a *prima facie* case based on Wesson's promotion to GM, they have not offered sufficient evidence that Hecht's decision was a pretext for age discrimination.

well as the lack of other circumstantial evidence of discrimination, we find that the Plaintiffs have not shown that Hecht's decision to give the job to Woosley was a pretext for age discrimination against them.

As to the DSM position, Bender clearly did not have significant skills or experience in sales and merchandising, having had different responsibilities throughout most of his time with the department store. He had documented problems with the company's plan-o-grams merchandising system, a system upon which Hecht's placed significant weight. Even given the one-year drop in Patton's performance appraisal, it was not unreasonable for Hecht's to by-pass Bender.

In contrast to Bender, Rafferty had over thirty years experience in retail, with approximately eight years as a DSM. He also boasted the highest raw score on the then-most recent appraisal, easily eclipsing Patton's score. Moreover, in the narrative section of one of his appraisals, Rafferty's supervisor noted that he "[s]upervised and aggressively drove merchandise movement from stockrooms and platforms to the sales floor with particular emphasis on key items and power center merchandise." While some of his coworkers have questioned his merchandising skills (especially his commitment to the plan-o-grams system) as well as his communication skills, he has likewise submitted personnel records and sworn statements countering these allegations. Viewed in the light most favorable to him as the non-movant, there is a question of fact whether he was as qualified as Patton for the open DSM position.

Yet, evidence that Rafferty was arguably as qualified as Patton may not be sufficient to survive summary judgment. The Supreme Court recently explored the standard to apply to "qualifications evidence," yet did not provide a firm resolution. In *Ash v. Tyson Foods, Inc.*, the Court rejected the Eleventh Circuit's formulation that "[p]retext can be established through comparing qualifications only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face," 126 S. Ct. 1195, 1197 (2006) (quoting *Ash v. Tyson Foods, Inc.*, 129 F. App'x 529, 533 (11th Cir. 2005) (internal quotations omitted)), and reiterated that "qualifications evidence may suffice, at least in some circumstances, to show pretext," *id.* (citations omitted). The Court went on to explain:

> The visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications. Federal courts, including the Court of Appeals for the Eleventh Circuit in a decision it cited here, have articulated various other standards, see, *e.g., Cooper* [*v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004)] (noting that "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question" (internal quotation marks omitted)); *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (C.A.9 2003) (holding that qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "'clearly superior'" to those of the selected job applicant); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1294 (C.A.D.C. 1998) (en banc) (concluding the factfinder may infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job"), and in this case the Court of Appeals qualified its statement by suggesting that superior qualifications may be probative of pretext when combined with other evidence, see 129 Fed. Appx., at 533. . . . It suffices to say here that some formulation other than the test the Court of Appeals articulated in this case would better ensure that trial courts reach consistent results.

*Id.* at 1197-98.

Likewise, we earlier rejected (in an unpublished opinion) a similar formulation by the Fifth Circuit that to establish pretext, the differences in qualifications must "leap from the record and cry out to all who would listen that [the plaintiff] was vastly – or even clearly – more qualified for the subject job." *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 994 (6th Cir. 2004) (unpublished) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)). We explained in that case that this circuit had never adopted the *Price* standard requiring a rejected applicant to show evidence of "vastly – or even clearly" superior qualifications, and we could not reconcile that standard with the Supreme Court's statement that qualifications evidence "may be probative of whether the employer's reasons are pretexts for discrimination." *Id.* at 994-95 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). We concluded that the plaintiff's evidence of superior qualifications compared to the chosen applicant was relevant to the question of pretext; given the other evidence of discrimination proffered by the plaintiff, we reversed the district court's grant of summary judgment in favor of the employer. *Id.* at 995.

Of course, acknowledging that evidence of comparative qualifications "may be probative" of pretext is a far cry from holding that such evidence is itself sufficient in all cases to raise a genuine issue of fact of discriminatory motive. For we need to balance the Supreme Court's statement in *Burdine* with the principles that employers are generally "free to choose among qualified candidates," *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), and that "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with," *Hartsel*, 87 F.3d at 801. As we explained in *Rowan*, a rejected applicant "must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful age-discrimination, not that other reasonable decision-makers might have retained the plaintiffs." 360 F.3d at 550.

Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. *See, e.g.*, *Jenkins*, 106 F. App'x at 995 (reversing lower court's grant of summary judgment; in addition to evidence of superior qualifications, the plaintiff provided evidence of "irregularities in the application and selection process," "inconsistencies in the reasons given . . . for not hiring her," and "the lack of African-American women in supervisory positions" at the company). On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual. This standard accords with several of our sister courts' standards, *see, e.g.*, *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005) ("What's more, in order to establish pretext, [the plaintiff] must establish that her credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question,' which she has failed to do." (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002))); *Cooper*, 390 F.3d at 732 (cited in *Ash*); and *Aka*, 156 F.3d at 1294 (cited in *Ash*), and is consistent with our own precedents, *see, e.g.*, *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) (explaining that "what matters" is the employer's perception of the applicant's qualifications, and noting that this court affords "great flexibility to employers when selecting management personnel") (citations omitted); *Hartsel*, 87 F.3d at 801; *Wrenn*, 808 F.2d at 502 ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates.").

This standard is also consistent with this court's en banc decision in *Wexler*. In that case, we cited with approval the D.C. Circuit's holding in *Aka*:

> If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Wexler*, 317 F.3d at 577 (quoting *Aka*, 156 F.3d at 1294). We ultimately rejected in *Wexler* a rigid invocation of the business-judgment rule to shield employers from claims of discrimination. *Id*. Likewise, we reject here – as we must, given *Burdine* – a rigid rule that qualifications evidence is never probative of pretext. Yet, when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation. *Cf. id*. at 576 ("One way for [a plaintiff] to [demonstrate pretext] is to show that [the employer's] asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.") (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988)). A laxer standard would move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a "super personnel department," overseeing and second guessing employers' business decisions. *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983).

Considering the qualifications of Patton and Rafferty next to each other, a reasonable decisionmaker could make a plausible case for selecting Rafferty over Patton, based primarily on his years of experience and solid performance appraisals. Yet, a different, albeit also reasonable, decisionmaker could make a plausible case that Patton was the better candidate:

- Patton had been recognized as a Pacesetter by the company, while Rafferty had never been rated above Hold/Other;

- Patton performed well in the largest store in the Nashville-area;

- there is a reasonable explanation for the one-year dip in his appraisal;

- even when he received the Marginal appraisal, his supervisors documented several achievements at the time, including exceeding sales expectations in a number of product lines and his "[e]xcellent planning and execution of moves for remodel"; and

- Patton's supervisors testified that he was a strong and talented merchandiser who understood and implemented the plan-o-grams system.

If two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the other's. Thus, Rafferty's qualifications evidence is not itself sufficient for his claim to survive summary judgment.

Rafferty's other evidence of age discrimination is scant. As pointed out earlier, there is no direct evidence of discrimination. As for indirect evidence, while the statistics drawn from the Nashville-area stores are sufficient to satisfy the relatively light *prima facie* burden, they lend little weight to rebut Hecht's legitimate, non-discriminatory rationale for selecting Patton. Rafferty has offered no reasonable theory explaining why Hecht's purportedly discriminated against him based on his age, yet apparently did not do so in other areas, at least in a way that would show up in the regional or divisional statistics. Nor has he provided any evidence of a history of age discrimination by Hecht's or The May Stores.

In the end, Rafferty simply has not offered enough other probative evidence to buttress his qualifications evidence.  Accordingly, as Rafferty has not raised a genuine issue of fact that Hecht's rationale for selecting Patton over him was pretextual, the district court properly granted summary judgment to Hecht's.

## IV.

For the preceding reasons, we AFFIRM the district court's grant of summary judgment to Hecht's.