**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0243n.06
Filed: March 31, 2009

**No. 08-3191**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


| | | |
|---|---|---|
| ROGER TURNER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| CITY OF AKRON, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |


**BEFORE:    SILER, COOK, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.**  Roger Turner sued his employer, the City of Akron, for claims of discrimination, retaliation, and retaliatory harassment. The City sought summary judgment, arguing inter alia that it had legitimate, nondiscriminatory reasons for its actions. Over Turner's opposition, the district court granted summary judgment to the City. Turner appeals.

For the reasons set forth below, we affirm. Even assuming arguendo that Turner has established his prima facie case, he has failed to show that the City's proffered reasons were pretextual. Accordingly, the City is entitled to summary judgment.

**I**

The district court set forth the background of this case in detail. *Turner v. City of Akron*, No. 5:06-CV-3023, 2008 WL 45376, at *1-2 (N.D. Ohio Jan. 2, 2008). In brief, the City began in 1985 to require that every new firefighter become a paramedic as a condition of employment. Turner began working for the City as a firefighter in 1988. He served as an active paramedic firefighter (aka "firefighter/medic") from 1989 to 2003.

In line with the paramedic requirement, new hires who are not already paramedics must attend paramedic school, which lasts approximately ten months and costs the City somewhere between $3,500 and $10,000 per trainee. It is the practice of the City to send its new hires to school early in their employment, so as to avoid the situation where the City has to terminate a firefighter several years after his or her hire date because the firefighter cannot become certified.

Turner filed his first lawsuit against the City in August 2002. In that action, Turner alleged that he was the victim of race-based discrimination and was exposed to a racially charged environment. He also alleged that he was the victim of retaliation following the filing of a charge of discrimination with the Equal Employment Opportunity Commission in 2001. The parties settled the lawsuit in 2003. As part of the settlement, Turner released the City from liability for all actual or potential claims then-existing.

In July 2003, Turner filed a charge of discrimination with the Ohio Civil Rights Commission to challenge a suspension. He alleged that the City suspended him in retaliation for filing previous charges of discrimination. The state commission issued a "no probable cause" determination on January 29, 2004.

Pursuant to the union contract, every October up to eight paramedics were permitted to opt

out of the paramedic program. In a letter dated September 5, 2003, Turner requested permission to

leave the program:

> Epiphany.
>
> I have decided to no longer participate in the paramedic program. By eliminating this requirement I will be able to devote 100% of my time towards other valuable efforts. Consider this my letter to withdraw per union contract.

Turner and seven other firefighter/medics were permitted to opt out in October 2003.

Since 2005, the firefighters' union contract with the City has required that the City pay all

active paramedic firefighters up to 164 hours of overtime annually to attend paramedic training.

That same year, Turner sought to re-enter the paramedic program. Deputy Chief Dale Evans

informed Turner that pursuant to the policy that then-Chief Charles Gladman imposed in 2005,

requests for re-entry would not be approved because of budgetary pressures facing the City. Neither

Turner nor any other firefighter who recently opted out of the paramedic program has been allowed

to re-enter.[1] Likewise, Turner's bids on various paramedic, SWAT-medic, and arson-investigator

positions have been denied, as have certain overtime opportunities available only to active

paramedics.

Turner filed the present lawsuit in 2006. In his complaint, Turner set forth four causes of

actions: retaliation in violation of Ohio Rev. Code § 4112.02(J) and 42 U.S.C. § 2000e et seq., and

racial discrimination in violation of Ohio Rev. Code § 4112.02 and 42 U.S.C. § 1981. Although

unclear from his complaint, Turner has also argued a claim of retaliatory harassment.

---

[1]One firefighter who opted out in 1999 was permitted to re-enter later that same year.

The City moved for summary judgment. Over Turner's opposition, the district court granted judgment in favor of the City. Turner now appeals that final judgment of the district court.

**II**

We review a district court's grant of summary judgment de novo. *Jones v. Potter*, 488 F.3d 397, 402 (6th Cir. 2007). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Turner has not come forward with any direct evidence of discrimination or retaliation. Thus, to establish his claims, Turner must satisfy the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). He must first make out a prima facie case. *Id.* at 802. At that point, the burden shifts to the City, which must give a "legitimate, nondiscriminatory reason" for its employment decision. *Id.* If it does so, the burden shifts a final time to Turner to show that the proffered reason was just a pretext for a decision actually motivated by discriminatory or retaliatory animus. *Id.* at 804.

Turner cites a litany of decisions by the City which he contends were discriminatory or retaliatory in nature. These are: (A) the City's refusal to let him re-enter the paramedic program and the denial of his bids for several paramedic positions and a position on the SWAT-medic unit; and (B) the City's decision not to select him as an arson investigator and other actions by the City involving discipline, sick time, and overtime pay. As explained below, assuming arguendo that

Turner has made out his prima facie case, he has failed to raise a genuine issue as to whether the

City's stated reasons for its actions were pretextual.

A.      **Turner's Request to Return to Active Paramedic Status**

As evidenced by his letter, Turner voluntarily left the paramedic program. The City contends

that since 2005, re-entry has been restricted by a rule put in place by Chief Gladman. The rule

against re-entry was intended as a cost-saving measure, according to the City. It stands unrebutted

that the City was facing difficult budgetary problems during this time. As the district court found,

this economic concern constitutes a legitimate, nondiscriminatory reason for denying Turner's

request:

> [The City] has brought forth evidence that it has, since 1985, required all newly hired
> firefighter/medics to become paramedics as a condition of employment. The record
> also shows that the collective bargaining agreement in place in 2005 and 2006
> required the City to pay overtime training for all paramedics and permitted up to a
> maximum of 164 hours per year in overtime to attend paramedic training. Having
> made the commitment to train all new recruits as paramedics, and having been
> required by the collective bargaining agreement to provide all active paramedics with
> overtime pay, it follows that the City could avoid additional overtime expenses by
> refusing to permit former paramedics to return to the program.

*Turner*, 2008 WL 45376, at *13 (internal citations omitted).

Turner argues that the district court uncritically accepted the City's position, applying in

effect the rigid business-judgment rule rejected by this court in *Wexler v. White's Fine Furniture,*

*Inc.*, 317 F.3d 564 (6th Cir. 2003) (en banc). He maintains, instead, that the City's rationale must

be pretextual because reactivating him would actually save the City money.

In *Wexler*, the en banc court explained, "An employer's business judgment . . . is not an absolute defense to unlawful discrimination." *Id.* at 576 (citation omitted). This does not mean, however, that the employer's rationale is simply to be discarded. While we cannot accept the employer's proffered rationale uncritically, "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). That is, although we cannot "invok[e] the business judgment rule to exclude consideration of evidence relevant to the question of pretext," *id.* at 577, we can consider "whether the employer made a reasonably informed and considered decision before taking an adverse employment action," *Smith*, 155 F.3d at 807. *See also Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981) (permitting an employee to establish pretext "by showing that the employer's proffered explanation is unworthy of credence"). It must be remembered that "'[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.'" *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006) (quoting *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996)).

In arguing that making him an active paramedic would save the City money, Turner faces a few hurdles. First, Turner admitted in his deposition that he did not know whether he had all of the training necessary to re-enter the paramedic program. Thus, it is at least questionable whether he could simply re-enter the program with little or no cost to the City. Moreover, it is undisputed that if he re-entered the program, he would be entitled to 164 hours of overtime annually for further training.

To get around the added cost of overtime, Turner hinges his argument on comparing the cost of moving him versus making a new hire. He argues that, given he is already a trained paramedic, moving him back into the program would save the City the cost of training a new hire as a paramedic.

This argument fails, however, to look at both sides of the ledger. Consider the circumstance that Turner asserts existed when the City rejected his initial request—the fire department was actually operating under-budget and needed to increase the level of manpower.

Making Turner an active paramedic while hiring another person to fill his non-paramedic position would make no financial sense given the City's long-standing policy that a new hire must either be or become a paramedic. If the new hire was already a paramedic, then Turner's training-cost advantage would disappear completely. And, given his seniority, his overtime costs would likely have been higher than the new hire's overtime costs.

If the new hire was not a paramedic, then the City would have had to pay for that person to become a paramedic. From the City's perspective, a new hire who was not a paramedic automatically comes with certain sunk costs: initial paramedic training costs and up to 164 hours of overtime annually. If the fire department truly needed new manpower, those were costs it could not avoid if it filled that need with someone who was not a trained paramedic. If it needed the new manpower to fill a paramedic position, then it made financial sense to do it with the new hire and not Turner, since it had to pay the sunk costs of training anyway and the new hire's overtime would be at a lower cost given the lower seniority. If the department needed the new manpower to fill a non-paramedic, firefighter-only position, then it would have made no sense to move Turner out of

that position of need into a position it did not need.

In short, Turner fails to consider that for the City to add manpower to the fire department, it had to incur the expense of training each new hire as a paramedic, regardless of whether it needed the firefighter as a paramedic or not. (Ignoring, of course, the situation where the new hire was already a certified paramedic, in which case Turner's pretext argument falls apart.) These are not costs it could avoid if, as Turner contends, the fire department needed manpower because it was understaffed. Thus, making Turner an active paramedic would not have avoided the costs of training a new hire or that new hire's right to overtime pay for training.[2]

Turner takes issue with the City's contention that it trains new hires to become paramedics early in their careers. While it is not mandatory that each new hire be trained immediately upon starting, it is undisputed that it is the City's practice to train the new hire as soon as practicably possible. In any event, there is no question that the City must incur the cost of training an untrained new hire at some point, even if not immediately. Turner's argument that the City could wait awhile before training a new hire does not avoid the inevitability of the cost to the City.

---

[2]As an aside, the only scenario in which it *might* make financial sense to move Turner to an active paramedic role is one that Turner argues does not exist: if the fire department was running at full manpower capacity. If, for example, the fire department did not need new manpower in absolute terms, but the *relative* need for paramedics increased in comparison to firefighters-only, then the department could save money by not having to bring on a new hire (and thereby become overstaffed), but simply move Turner back into the paramedic program. Yet, there is nothing in the record to suggest that this scenario has existed since 2005. Officials uniformly testified that the fire department had sufficient numbers of paramedics to fill its needs on a department-level basis. The occasional opening of a paramedic position due to a retirement does not suggest otherwise, as an already active firefighter/medic can be transferred from stationhouse to stationhouse.

The City also has shown that it has applied the rule against re-entry in a uniform and non-discriminatory manner. It has represented that no one who voluntarily left the program has been permitted to re-enter since financial restrictions were made known to Chief Gladman in 2005. While one person was permitted to re-enter, that took place in 1999 before any financial restrictions were placed on the fire department.

In the final analysis, Turner is simply not a low-cost alternative to a new hire. If, as he contends, the fire department has unmet manpower needs in the paramedic program, the City has convincingly shown that filling those needs with a new hire is cheaper than moving Turner. Whether the fire department made the "perfect decision[]" under all possible scenarios is not a standard it was required to meet under the law. *Bender*, 455 F.3d at 626. Thus, as did the district court, *Turner*, 2008 WL 45376, at *13-14, we find that Turner has not raised a genuine issue as to whether the City's stated rationale for refusing him readmittance into the paramedic program was a pretext for unlawful discrimination or retaliation. Likewise, his claims involving the City's denials of his bids for various paramedic and SWAT-medic positions, each of which would have first required his re-entry into the paramedic program, also fail.

**B. Other Alleged Acts of Discrimination, Retaliation and Harassment**

On the other alleged acts of discrimination, retaliation, and harassment, we find no genuine issue of material fact. A review of the record shows that, at best, Turner was as qualified as the two persons who were selected to be arson investigators. However, being "as qualified" is not enough to show pretext under these facts. As the court explained in *Bender*, "[E]vidence that a rejected

applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." 455 F.3d at 627. Without some evidence of improper animus, a job candidate cannot show pretext simply by pointing out that he was arguably as qualified as the person who was actually selected.

The remaining instances of purported discrimination and retaliation are equally unavailing. His claim that he was denied overtime is part of his larger claim that he was denied re-entry into the paramedic program or denied a transfer to another program. As for the two days for which he was docked pay, those were the result of the fire department's non-discriminatory workplace policies governing discipline and sick days. He has failed to raise any genuine issue of pretext by showing, for example, that the department did not dock the pay of a Caucasian firefighter involved in a similar incident. For the reasons more fully explained by the district court, we affirm on these claims as well. *Turner*, 2008 WL 45376, at *16-18.

Finally, Turner contends that the district court erred by not striking certain documents submitted by the City. We find that the district court did not abuse its discretion as to how it handled these documents.

### III

Accordingly, for the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of the City.