NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0406n.06

No. 18-2319

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 05, 2019
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| DEON McQUEEN, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| WILLIAM P. BARR, | ) | **OPINION** |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: SILER, STRANCH, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Deon McQueen was a correctional officer with the Federal Bureau of Prisons. And apparently, he really wanted a different job. McQueen applied, unsuccessfully, for more than a dozen different positions within the Bureau—ranging from case manager to drug treatment specialist to sheet metal foreman. McQueen alleges that his lack of success was because of racial discrimination. But the Bureau disagrees, explaining that McQueen was just not as qualified as the successful candidates for each position. The district court sided with the Bureau and granted summary judgment in its favor, explaining that McQueen failed to present evidence that the Bureau's nondiscriminatory reasons were pretextual. The district court also dismissed McQueen's related claim that the Bureau retaliated against him once he complained about the alleged discrimination. We affirm.

**I.**

In 2009, McQueen started working as a correctional officer at the federal prison near Milan, Michigan (operated by the Federal Bureau of Prisons). Before that, McQueen had a meandering history of employment. After high school, McQueen attended community college and Eastern Michigan University, earning a 2.77 GPA with a degree in criminology. McQueen spent time working at Blanche Kelso Bruce (BKB) Academy, a private high school in Detroit. McQueen was a self-described "teacher assistant" at BKB; where he would provide security, work in a drug rehabilitation program, and teach various classes as needed. McQueen left BKB and became a temporary, part-time employee at a Ford Motor plant. This meant that McQueen's role would shift day-to-day to different positions on the line (again, as needed). But just over a year in, McQueen left that job, too. The parties dispute whether Ford fired McQueen for insubordination, or whether he was simply the victim of downsizing at the plant. Between jobs, McQueen also spent time helping his wife at her in-home daycare center.

McQueen eventually landed with the Bureau, starting as a correctional officer. McQueen became a senior correctional officer three years later (after an automatic promotion kicked-in). During that time, McQueen received no awards or special recognition within the Bureau. But McQueen did complete a master's program in criminal justice. His thesis was entitled: "The individual and collective consequences of mass incarceration in the African American community."

McQueen then began to apply for other positions within the Bureau. At this point, McQueen had reached the level of GS-7 on the government pay scale. To apply, McQueen could use an automated system to view available positions and submit his application. The automated system would send all applications to the Bureau's human resources office in Texas. For each position, human resources would take the first cut at narrowing the pool of applicants. This involved sending a list of "best qualified" candidates—i.e., the candidates that met the job's minimum requirements—along with a packet of information on each candidate, to the hiring official. From this starting point, the hiring official would review each candidate's references (also known as "vouchers"), education, experience, seniority, training, and other relevant factors to make the final decision. For McQueen, Warden James Terris was the hiring official for three positions he applied for but didn't get—all allegedly because of racial discrimination. These jobs were case manager, drug treatment specialist, and sheet metal foreman.

## II.

We review de novo a district court's order granting summary judgment, using the same Rule 56(c) standard as the district court. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

For claims based on circumstantial evidence of racial discrimination, we employ a burden-shifting analysis. We start with our focus on the plaintiff—who carries the original burden to establish a prima facie case. This means the plaintiff must show: (1) he is a member of a protected class; (2) he applied for and was qualified for the position; (3) he was considered for and denied the position; and (4) another employee of similar qualifications who was not a member of the

protected class got the position. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). But this is not an onerous burden. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And at this step, the Bureau does not dispute that McQueen can satisfy his low burden. (*See* Appellee's Br. at 18 ("Here, the district court assumed . . . that McQueen could establish a prima facie case. Therefore, this Court may begin with the second step of the analysis.").) Indeed, McQueen is African-American, he applied for all three positions, human resources placed him on the "best qualified" list for each position, but nonetheless, a white candidate ultimately got each job.[1]

So next, "the burden shifts to the defendants to articulate a 'legitimate, non-discriminatory reason' for the employment decision." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)). But like step one, this is only a "slight burden," *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 429 (6th Cir. 2007), which we have described as just "a burden of articulation." *Braithwaite*, 258 F.3d at 493. An employer can satisfy this burden by "simply 'explain[ing] what [it] has done' or 'produc[ing] evidence of legitimate nondiscriminatory reasons.'" *Halfacre*, 221 F. App'x at 429 (quoting *Bd. of Trs. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978)).

Here, the Bureau has done just that: it explained that, for each position, the candidate selected was more qualified than McQueen. For example, Warden Terris detailed each hiring

---

[1] To be fair, the Bureau did hire one African-American. The Bureau hired three white candidates as case managers and a white candidate as sheet metal foreman. But of the two candidates hired as drug treatment specialists, one was white, and one was African-American.

decision (including what factors were important to him) and explained why he chose each successful applicant over McQueen. The Bureau also filed all the candidates' applications—detailing each candidate's experience and qualifications. This is enough for the Bureau to meet its burden: "Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason." *Hawkins v. Memphis Light Gas & Water*, 520 F. App'x 316, 319 (6th Cir. 2013) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011)); *see also Wren v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates.").

### III.

This takes us to the third and final step, where "the burden shifts back to [the plaintiff] to show that [the employer's] reason is a pretext for racial discrimination." *Halfacre*, 221 F. App'x at 429 (citing *Burdine*, 450 U.S at 253). A plaintiff may establish pretext by showing that the employer's stated reason for its employment action "(1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Id.* at 429–30. To accomplish this, "once a defendant has advanced a non-retaliatory reason for [its decision]," the plaintiff must "come forward with evidence that would tend to undermine the legitimacy of that reason." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 533 (6th Cir. 2012). Without some evidence, a plaintiff cannot simply "rely on the hope that the trier of fact will disbelieve [the employer]." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). So at this final step, McQueen was required to provide evidence that would undermine

the Bureau's reason for not promoting him—i.e., that the successful candidates were more qualified.

To start, McQueen seems to confuse the different steps in our burden-shifting analysis. For example, McQueen argues, at length, that he was qualified for each position. But as we explained, that is just step one in our analysis. And we assume, as did the district court, that McQueen was qualified (and could make out his prima facie case). McQueen even argues, incorrectly, that establishing a prima facie case can get him past summary judgment and to a jury. As for the critical question, his burden under step three, McQueen fails to meaningfully address the qualifications of the hired candidates.

Still, reading McQueen's arguments liberally, he points to *some* evidence in an attempt to undermine the Bureau's hiring decisions. McQueen mentions three issues to show that he was in fact more qualified than the successful candidates: (1) he was on the "best qualified" list, (2) his government pay scale level, and (3) the length of his tenure with the Bureau.[2]

First, every applicant that makes it to the hiring official's desk is considered a "best qualified" candidate. This rating does not reflect whether human resources recommends one candidate over another, but simply lists all qualified candidates for the hiring official to consider. Second, McQueen's level on the government pay scale says nothing about his relevant

---

[2] McQueen briefly argues that hiring veterans somehow shows that the Bureau engaged in racial discrimination against McQueen, a non-veteran. McQueen cites cases explaining that the Veterans' Preference Act, 38 U.S.C. § 4214, does not apply to promotions. But even entertaining this argument, an employer is certainly allowed to consider a veteran's relevant experience when making a hiring decision, even if the employer is not statutorily required to give the veteran preference over other candidates.

qualifications. Nor does the length of McQueen's tenure. These numbers simply show how long McQueen has worked for the Bureau and what generic level of pay McQueen qualifies for. In contrast, these numbers say nothing about whether McQueen gained relevant experience during that tenure. For example, if the open position was to provide medical care for prisoners, the fact that a correctional officer had ten years on the job does not mean that he is more qualified than a recent medical school graduate. Indeed, Warden Terris explained how important it was for a candidate to have relevant (and recent) "experience *in the discipline* that you are hiring for." (Terris Dep., R. 22-20 at 73, 75–76 (emphasis added).) In sum, none of these arguments undermine the Bureau's legitimate reason for not hiring McQueen.

**IV.**

Next, we compare the actual qualifications of the successful candidates to McQueen. The district court engaged in this analysis, concluding that McQueen was not the victim of discrimination. But before we do, a caveat about our review is worth mentioning. "In conducting a comparison of the candidates' qualifications, we do not substitute our judgment for that of management." *Hawkins*, 520 F. App'x at 320 (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004)). "Instead, we 'simply compare characteristics such as differences in job title, responsibilities, experience, and work record,' in order to make an informed determination regarding whether an employment decision was based on pretext." *Id.* (quoting *Johnson v. Metro. Gov. of Nashville & Davidson Cty.*, 502 F. App'x 523, 539 (6th Cir. 2013)) (internal quotation marks and brackets omitted). And when, as here, McQueen relies on his alleged superior qualifications, comparative qualifications can create an issue of fact "as to pretext where the

evidence shows that . . . the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former." *Bartlett v. Gates*, 421 F. App'x 485, 490–91 (6th Cir. 2010) (citing *Bender v. Hecht's Dep't. Stores*, 455 F.3d 612, 627 (6th Cir. 2006)). Even taking the facts in the light most favorable to McQueen (as the non-moving party), we find that he cannot make this showing for any of the three positions he applied for.

**A.**

McQueen first applied to become a case manager. This job included duties much like that of a counselor—meeting with prisoners, conducting group and individual therapy sessions, preparing reports, and managing patient caseloads. Warden Terris also testified that, for this position, key factors were seniority, collateral training with the Bureau (such as crisis support), and administrative experience.

In his application, McQueen listed his relevant experience as a correctional officer, his time at BKB, and his master's degree thesis. McQueen characterized his experience at BKB to include "conducting group sessions concerning drugs and alcohol . . . and individual and group counseling." (McQueen Appl., R. 22-12 at 2–3.) And McQueen explained that his master's thesis and coursework "directly related to alcohol and drug abuse." The Bureau, however, disputes whether McQueen accurately represents his experience—and notes that his thesis does not address drug or alcohol abuse.

In any event, the Bureau selected three qualified candidates. Indeed, using McQueen's preferred seniority metric, he was less qualified than two of the successful candidates, Matthew Burnett and Gregory Dew, who had been with the Bureau for twelve and fourteen years

8

respectively (to McQueen's four). Also, all three successful candidates, unlike McQueen, had years of military and administrative experience. All three had better academic records, and two had also received awards for their work with the Bureau and the Navy, whereas McQueen had not received any awards. In other words, these comparative characteristics do not show pretext in the Bureau's hiring decision for case manager because, simply put, McQueen was not a plainly superior candidate for this position. *See Bender*, 455 F.3d at 627–28.

**B.**

McQueen then applied to become a drug treatment specialist. This position provided counseling to inmates with a history of drug or alcohol abuse. To start, McQueen argues that he was more qualified than both successful candidates because he, unlike them, had experience with the Bureau. But as we've explained, that is not necessarily the correct inquiry. For this role, Warden Terris explained what *relevant* experience he was looking for: candidates with recent counseling experience—and candidates with extensive research history or experience providing large-group counseling.

That is exactly the type of experience the two successful candidates brought to the Bureau. Keneesha White had six years of counseling experience (right before joining the Bureau), including roles as a case manager, research specialist, clinical therapist, and mental health therapist. And so did Christine Streu; adding another six years of recent counseling experience—in many environments—including an adult psychiatric hospital, foster homes, and a juvenile detention center. In other words, both candidates had extensive histories of providing relevant counseling services. Indeed, White was a licensed drug-abuse counselor.

9

In contrast, McQueen relies, again, on his role as a "teaching assistant" at BKB. Even if McQueen provided some form of counseling at the academy, it had been more than five years since he served in that capacity. And he had no relevant training or certifications. As a result, these comparative qualifications do not show pretext when the Bureau hired two well-qualified candidates as drug treatment specialists.

## C.

McQueen also applied to become a sheet metal foreman at the prison. This job was much like it sounds: working in a factory, overseeing the use of various machines, and supervising inmates working in the shop. But again, McQueen runs into the same problem: the Bureau selected a highly qualified candidate. Indeed, the successful candidate had superior (and more recent) experience in a metal-working shop. And before that, he worked as a mechanical technician, fixing cars and planes for years (including time in the military). In contrast, McQueen spent a little over a year with Ford, as a temporary employee. As the district court put it, McQueen "had no hands-on experience similar to that of the successful candidate."

In sum, for all three positions, "a reasonable decisionmaker could make a plausible case for selecting" the successful candidates over McQueen. *Bender*, 455 F.3d at 628. This means that McQueen was not "plainly superior" and cannot rely on the comparative qualifications between the successful candidates and himself to create an issue of fact about pretext. *Bartlett*, 421 F. App'x at 491. And McQueen cannot meet his burden under step three in our analysis. We affirm summary judgment on the discrimination claim.

**V.**

For his next claim, McQueen argues that the Bureau retaliated against him for filing discrimination complaints with the Equal Employment Opportunity Commission (EEOC). McQueen reached out to the EEOC on May 29, 2013—and again on October 2, 2014. To survive summary judgment, McQueen must show that the Bureau *knew* that McQueen made these filings with the EEOC, and in response, took "adverse employment action" against him. *Hunter v. Sec'y. of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009) (quoting *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)).

McQueen points to a few "adverse" actions by the Bureau: threats of sanctions, allegations of poor performance, and unwarranted on-the-job monitoring. These allegations relate to either Captain James Taylor or Lieutenant Rhonda Ellerman. McQueen says that Taylor gave him undeserved-negative evaluations (also known as "vouchers"), because Taylor wanted to retaliate against McQueen for contacting the EEOC. McQueen thinks these bad evaluations prevented him from getting a promotion. McQueen alleges that Ellerman retaliated by threatening him and monitoring his on-the-job performance through surveillance (again, undeserved).

But the district court dismissed these allegations because McQueen failed to show that either Taylor or Ellerman knew about the EEOC complaints before the alleged retaliation took place. As we have explained, evidence of that knowledge is critical for retaliation claims. *See Mulhall v. Ashcroft*, 287 F.3d 543, 551–52 (6th Cir. 2002) (affirming summary judgment where plaintiff "failed to produce any evidence, direct or circumstantial, to rebut [employees'] denials" that they "*knew or were aware of his protected activity*") (emphasis original).

11

To start, the Bureau never told Ellerman (or any lieutenant) about employee complaints, from McQueen or otherwise. And Ellerman explained that she did not learn of McQueen's complaint until the EEOC contacted her about it months after she reprimanded him. McQueen does not dispute this. As for Taylor, McQueen presented no evidence that Taylor knew of the EEOC complaints before he completed the vouchers. To the contrary, Taylor said that he was unaware of McQueen's EEOC activity. And as the district court observed, by the time we know Taylor became involved with the EEOC proceedings, on September 24, 2014, Taylor had already completed McQueen's evaluations. By this point, the Bureau had also completed the relevant hiring decisions. In other words, McQueen fails to point to any evidence that Taylor had the necessary knowledge to retaliate when he completed the vouchers.[3]

\*　　\*　　\*

We affirm the district court.

---

[3] The testimony of Kenneth Juhasz does not change the result. Juhasz testified that he believed McQueen's involvement with the union and his EEOC complaint were factors in Taylor's negative evaluations. But Juhasz admits that Taylor never made any comments about McQueen's EEOC activity. (Indeed, he only spoke with Taylor at, or just before, the September 24, 2014 mediation.) And Juhasz's pure speculation over Taylor's motivations cannot save McQueen from summary judgment. *See, e.g.*, *DePalma v. Sec'y of Air Force*, 754 F. App'x 321, 328 (6th Cir. 2018) (finding that a witness's "speculation on the motivation behind [an employment decision], if taken as true, does not create a genuine issue of material fact . . . without other supporting evidence").