NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0535n.06

Case No. 23-5385

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 21, 2023
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| DWUAN HAMMOND, ) | |
| ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, ) | UNITED STATES DISTRICT |
| ) | COURT FOR THE WESTERN |
| v. ) | DISTRICT OF TENNESSEE |
| ) | |
| SYSCO CORPORATION, ) | |
| ) | **O P I N I O N** |
| Defendant-Appellee. ) | |
| ) | |

Before: MOORE, McKEAGUE, and KETHLEDGE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Dwuan Hammond claims that his former employer of nearly twenty years, Sysco Corporation, refused to promote him to upper-level jobs because of his race. And after he reported his concerns of discrimination, he believes Sysco retaliated against him. The district court granted Sysco summary judgment on both of Hammond's claims. Finding no error, we **AFFIRM**.

## I.     BACKGROUND

### A.     Hammond's Early Work at Sysco

Sysco distributes food and related products throughout the United States. Given its national coverage, Sysco organized its operations into tiers during the time relevant to this case. Overseeing the entire operation was the company's central executive leadership. The corporation then divided its operations into geographic markets: for example, the Northeast or the South. And

those markets were sub-divided into operating companies serving a specific metropolitan area like Grand Rapids.

Hammond (a Black man) joined Sysco in 2000. He began as an internal auditor at the general corporate level. While in that position, Hammond performed "operational and financial audit[s]" on Sysco's subsidiaries. Hammond Dep., R.79-6 at PageID 434.

For a while, his employment at Sysco progressed smoothly. After two and a half years as an internal auditor, Sysco asked Hammond to serve as a controller for its East Wisconsin operating company. Functionally, that position required Hammond to act as the organization's financial leader. Hammond was named the operating company's director of finance just six months later. Despite the change in title, Hammond remained "responsible for all the finance." Hammond Resp. to Facts, R.93-1 at PageID 654.

In mid-2005, Hammond left Sysco for a competitor. But he did not stay for long.

Hammond returned to Sysco in November 2005. Again, he had a new title. For the next eight years, he would serve as vice president and chief financial officer of the Grand Rapids operating company. During his time as VP/CFO, Hammond led the operating company's financial organization and was a partner to the president. In 2013, Hammond became VP/CFO of a "larger subsidiary"—the Memphis operating company. Hammond Dep., R.79-6 at PageID 443. Hammond (at least initially) excelled in his Memphis role. He received a high rating—significantly above target—in his July 2014 annual performance review. And three people sponsored Hammond for his individual development plans, which were designed to help him further develop his skills.

**B.      Hammond's Pursuit of Upper-Level Positions**

Hammond then started pursuing market-level VP/CFO and operating company president positions. Up to that point, according to one Sysco employee, no Black people had ever been promoted to those positions.

Hammond's first attempt came in the fall of 2015. Sysco had an opening for VP/CFO of its Northeast market. Market VP/CFOs are generally the market's lead finance person. One of the job's minimum qualifications is "10 years [of] finance or accounting management experience." Market VP/CFO Job Description, R.79-4 at PageID 364. But Hammond was not selected for the Northeast market job. Bill Mastrosimone—the Sysco executive charged with selecting a candidate—hired Jason Calabrese instead. Calabrese interviewed well, had roughly fifteen years of finance leadership experience, and was already located in that market. Mastrosimone thought Hammond was not as qualified as Calabrese because Hammond had less "well-rounded finance leadership experience." Mastrosimone Decl., R.79-11 at PageID 580.

It did not take long, however, for Hammond to receive a market-level role. In early 2016, he started as director of revenue management for Sysco's Mideast—later South—market. He was the only Black member of the South market's team. Hammond viewed that position as an opportunity to become a "complete, more well-rounded" applicant. Hammond Dep., R.79-6 at PageID 448. As director of revenue management, Hammond had to focus on profitability and manage VPs of sales. Before then, Hammond did not "have [direct] Sysco sales supervisory experience." *Id.* At most, he had worked closely with a VP of operations.

Around the same time that Sysco promoted Hammond to his market-level position, another market VP/CFO position opened up. Now, it was for the Rocky Mountain (later Mountain Central) market. But Hammond never applied for that job. The market president, Rich Johnston, hired

Roger Wilder. That selection did not surprise Hammond. Wilder was the "front runner" because Sysco was eliminating his corporate position, and he was "just as qualified" as Hammond. Hammond Resp. to Facts, R.93-1 at PageID 662. Indeed, Wilder had nearly two decades of experience in various financial leadership roles.

In early 2017, another new opportunity arose. The president of Sysco's Memphis operating company, Pete Scatamacchia, was leaving Sysco. To take his place, the company wanted someone with substantial experience in (1) leadership "over sales or operations," (2) "profit and loss" responsibilities, and (3) "large team leadership." *Id.* at 655. Additionally, Sysco focused its selection process on those who had served as an executive VP for one of its operating companies. Educational background was not one of the considerations. Nor was Scatamacchia's recommendation.

Sysco believed Charles Whitby checked all the necessary boxes. Whitby had served as the executive VP for one of the corporation's largest operating companies—Sysco Chicago. Before that, he was the president of one of Sysco's competitors. In Sysco's view, Hammond's qualifications did not stack up as well. Though he had a business and master's degree (which Whitby did not), Hammond was not an executive VP and lacked the necessary sales leadership skills. Sysco ultimately hired Whitby.

By the end of 2017, things weren't looking up for Hammond.

*First*, he missed out on another market-level VP/CFO position—one for the South market. However, he never applied for the role. Sysco hired John Summers Miller, who had more than fifteen years of financial leadership experience in the industry.

*Second*, Hammond's work performance began to decline. His supervisor, Trey Kidd, received reports of poor communication and leadership between Hammond and the VPs in sales.

Some at Sysco, including senior director Becca Abbate, recommended "moving him out of the company." Abbate Email, R.93-3 at PageID 738. Kidd instead discussed the performance issues with Hammond during his mid-year review. Ken Jaycox, a Sysco employee who Hammond testified previously recommended him for an executive VP position, also reached out to Hammond. Among other things, Jaycox raised concerns about Hammond's leadership engagement and indicated that Hammond would "not be considered for other roles at Sysco" until he developed those skills. Jaycox Email Chain, R.79-4 at PageID 406. Jaycox also recommended some actions that he thought might help Hammond overcome these deficiencies. But Jaycox did so with a caveat; he recognized that Hammond was "clearly the best person to calibrate and recommend a course of action." *Id*. at 405. Responding to Jaycox, Hammond admitted that he had "not directed [his] attention to the VPs of [s]ales." *Id.*

Despite Jaycox's warning about Hammond's decreased chances for promotion, Hammond applied for the Pacific and Midwest market VP/CFO positions in 2018 and 2019. Like before, he was not selected.

In December 2018, Sysco promoted Doug Walker to VP/CFO of the Pacific market. The company believed Walker was a good fit for several reasons. To begin, Walker had significant finance leadership experience and worked in a senior leadership position in Sysco's finance department. Further, Johnston—the decisionmaker—was confident in Walker's qualifications given the two's history working together in the Rocky Mountain market. In contrast, Hammond worked in revenue, not finance, and lacked market VP/CFO experience. To make matters worse, Hammond also appeared unwilling to relocate to the Pacific area.

The hiring decision for Sysco's Midwest market VP/CFO position, which the company made in January 2019, had a similar conclusion. Sysco selected Mark Lee over Hammond

because, in its view, Lee had more recent and substantial finance experience and more connections in the Midwest. Hammond saw things differently. Though he admitted that his and Lee's resumes were equally strong, Hammond thought he had better relationships and work experience.

A few months later, Hammond reported concerns of race discrimination to Sysco's human resource department.

Hammond's work soon faced more criticism. In May 2019, Kidd received complaints about Hammond's communication style with operating company presidents in Hammond's market. Still, Sysco gave Hammond an opportunity to rebound by placing him on a performance improvement plan. In doing so, Sysco did not change Hammond's salary, benefits, or job duties.

In the months that followed, Hammond's worries of race discrimination persisted. He hired counsel, who reiterated Hammond's concerns to Sysco. In a July 2019 letter to Sysco's president and chief executive officer, Hammond's counsel accused Sysco of placing a glass ceiling on qualified Black employees and threatened litigation. In June 2020, Sysco's CEO emailed the company's associates, addressing George Floyd's death. Hammond responded to that email, relaying criticism about Sysco's approach to diversity and inclusion.

C.      **Hammond's Termination**

Two months later, Hammond lost his job. Sysco claims his termination was part of a large-scale corporate reorganization in response to COVID-19. In total, Sysco laid off nearly 160 employees. Hammond was one of the unfortunate 160 because Sysco was downsizing from six regional managers to four and his supervisor—Kelly Melvin—determined that he ranked the lowest among the company's revenue management directors. Her ranking relied primarily on performance reviews, talent reviews, and leadership assessments. When making that determination, Melvin was not aware of Hammond's complaints of discrimination. Indeed,

Melvin decided to terminate Hammond before Hammond sent his June email. She made that choice despite a report suggesting that Hammond's market, by at least one metric, outperformed others during May 2020.

**D.     Hammond's Lawsuit**

Around four months after losing his job, Hammond filed a lawsuit against Sysco. In his amended complaint, Hammond alleged, in relevant part, race discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Specifically, he accused Sysco of denying him promotions because of his race. Hammond also posited that Sysco retaliated against him by placing him on a performance improvement plan and terminating him after he reported potential discrimination.

Sysco denied those allegations and later moved for summary judgment. The district court granted Sysco's motion and dismissed Hammond's claims. In making that ruling, the court determined that some of Hammond's claims failed at the prima facie stage, and others failed because Hammond could not show pretext. Hammond timely appealed.

## II.     STANDARD OF REVIEW

We review the grant of summary judgment de novo. *Waters v. Becerra*, 80 F.4th 782, 786 (6th Cir. 2023). Accordingly, our inquiry is the same as the district court's below: Has Sysco shown that there are no genuine disputes of material fact, and is it entitled to judgment as a matter of law? *See* Fed R. Civ. P. 56(a). If so, then summary judgment is appropriate. *Id.* A genuine dispute exists only when a reasonable jury can find for the nonmovant (here Hammond). *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). After the movant makes its initial showing, the nonmovant must direct us to *evidence* showing a genuine dispute. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 256 (1986). Neither conclusory allegations nor speculation will do. *See id.*; *see also Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

In making the above determination, this Court follows a few rules. First, we must draw all inferences in Hammond's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Second, we cannot make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 255. We reserve the latter tasks for the jury. *See id.*

### III.     ANALYSIS

Hammond argues that his race discrimination and retaliation claims should have survived summary judgment. In his view, genuine disputes of material fact exist as to both. We assess the accuracy of that contention, starting with Hammond's discrimination claims.

### A.     Discrimination Claims

Hammond asks us to review the district court's ruling concerning six jobs for which he believes Sysco discriminatorily denied him a promotion. The first is the Memphis operating company president role. The other five are the VP/CFO positions for the following markets: Northeast, Mountain Central, South, Pacific, and Midwest.

We assess employment discrimination claims based on circumstantial evidence, as here, using a three-step framework. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Step one requires a plaintiff to establish a prima facie case of discrimination. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023). If a plaintiff does so, step two then shifts the burden to the defendant and requires it to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant similarly carries its burden, the burden then returns to the plaintiff to show that the defendant's reasons were merely a pretext for discrimination. *Id.* To

be clear, it is the burden of *production* that shifts between the parties; the ultimate burden of *persuasion* always remains with the plaintiff. *See Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).

### 1.    Prima Facie Case

The district court concluded that Hammond failed to establish a prima facie case regarding three of his discrimination claims for failure to promote. Despite Hammond's arguments otherwise, each of those determinations was correct.

A prima facie discrimination case for failure to promote has four elements. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000). Specifically, a plaintiff must demonstrate that: "(1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions" when the plaintiff's request was denied. *Id.* This standard is not "onerous." *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Burdine*, 450 U.S. at 253). Even so, the undisputed facts show that Hammond cannot satisfy the second element for three of his claims.

### a.

Begin with the Mountain Central and South market VP/CFO positions. Hammond concedes that he didn't apply for either job. Accordingly, his prima facie case for those positions falls short.

Hammond argues that we should not fault him for not applying because there was no process in place for him to do so. This Court has previously found arguments like Hammond's persuasive. We have held that a formal application is not always necessary. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145 (6th Cir. 1989). One situation warranting a "loosened" application

requirement is when an employer fills a position "without asking for applications or posting the opening." *Id.* at 146 (quoting *Box v. A & P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985)). Hammond has not, however, established that Sysco adopted that approach for its market VP/CFO positions. At most, Sysco admits that it does not require its market *president roles* to be posted internally or externally. And though Hammond contends that those selected for the positions at issue did not apply for the job, he does not provide relevant record support. His conclusory allegation alone is not enough to raise a genuine dispute of material fact. *See Anderson*, 477 U.S. at 256. Hammond therefore fails to show a prima facie discrimination claim for the Mountain Central and South positions.

**b.**

Now consider the president position for the Memphis operating company. The district court held that Hammond could not allege a prima facie case because he did not demonstrate that he was qualified for the job. We agree.

To assess the qualification prong of the prima facie test, we focus on the plaintiff's objective qualifications. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). Generally, that means considering things like the plaintiff's education, experience, and whether he or she possesses required skills. *Id.* at 576. But not every factor is always relevant; our assessment must conform to the minimum qualifications for the job in question. *Id.*

Even when viewed in the light most favorable to Hammond, his experience in early 2017 was not what Sysco had in mind for its Memphis operating company's new president. Everyone agrees that Sysco wanted someone with "*substantial* leadership experience over sales or operations," profit and loss responsibility, and large team leadership. Hammond Resp. to Facts, R.93-1 at PageID 655 (emphasis added). Hammond's resume did not meet that requirement.

Hammond was promoted to director of revenue management for Sysco's South market—a position that required him to focus on profitability and sales—only one year earlier. Before working in that position, Hammond concedes that he "didn't have Sysco sales experience." *Id.* at 654–55. Hammond's only other potentially relevant experience was his time (roughly a year and a half) working with a VP of operations. Accordingly, Hammond did not possess "substantial leadership experience over sales or operations." His prima facie claim for this position fails.

\* \* \*

In reaching the same conclusions that we do here, the district court did not err. As a result, only Hammond's claims regarding the Northeast, Pacific, and Midwest VP/CFO positions remain. All agree that Hammond asserts a prima facie case for each.

### 2. Legitimate, Non-Discriminatory Reason

The district court correctly determined that Sysco presented a legitimate, non-discriminatory reason for the decisions underlying Hammond's remaining discrimination claims. Although Hammond does not appear to contest that conclusion, we briefly explain why the court was right. Put simply, hiring a more qualified candidate is a sufficient non-discriminatory reason. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011). And for each of the remaining positions, Sysco presented evidence that it hired others because they were more qualified than Hammond, based on the criteria Sysco used in its search.

### 3. Pretext

That brings us to the last step of our three-part framework. The burden returns to Hammond to show that Sysco's proffered reason is merely a pretext for discrimination. *Levine*, 64 F.4th at 797. Hammond must produce enough evidence to enable a jury to reasonably reject Sysco's explanation for refusing to promote him. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400

(6th Cir. 2009). The district court determined that Hammond didn't meet that burden. Again, we see no error in that holding.

Generally, a plaintiff has three main ways to show pretext. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). It can argue that the employer's reason (1) has no basis in fact, (2) did not actually motivate the employer, or (3) was insufficient to deny the plaintiff a promotion. *Id.* The reasonableness of an employer's decision is relevant to determining whether the proffered reason actually motivated the decision. *Wexler*, 317 F.3d at 576–77. Hammond appears to pursue some variation of the second option and to also challenge Sysco's decisions' reasonableness. None of his arguments satisfy his burden.

**a.**

First, he contends that the individuals selected for promotion—Jason Calabrese, Doug Walker, and Mark Lee—were not actually better candidates for the Northeast, Pacific, and Midwest VP/CFO positions. For us to agree, Hammond must show he was *significantly* better qualified for the job. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). Unfortunately for Hammond, he has not made such a showing. Each of his asserted superior qualifications either conflicts with the record or is insufficient as a matter of law.

Hammond first claims he is more qualified than those selected because of his "many years of loyal and successful service" to Sysco. Appellant's Br. 24; *see also id.* at 27. Hammond's tenure, spanning roughly fifteen to nineteen years when he applied for the positions, is certainly admirable. And Hammond is correct in noting that he received a high rating during his performance review in 2014. But neither point makes him any more qualified than the other candidates. Rightly or wrongly, the VP/CFO position's minimum and preferred qualifications do

not consider a candidate's history with the company. We are in no position to second guess that business decision. *Bender*, 455 F.3d at 627 (observing that this Court does not act as a "super personnel department").

Hammond similarly contends that company data comparing his market's performance to other markets demonstrates his superior qualifications. Again, for the same reason that his history with the company is insufficient, such data does not make Hammond more qualified. In any event, the data Hammond relies on did not exist until 2020—*years after* Sysco filled the positions at issue. Accordingly, no reasonable jury could rely on that evidence to conclude that Hammond had an edge over the others during the relevant time.

For his third argument, Hammond directs us to an email from Ken Jaycox. At one point, Jaycox referred to Hammond as the "best person to calibrate and recommend a course of action." Jaycox Email Chain, R.79-4 at PageID 405. Hammond interprets that language to suggest that Jaycox believed that Hammond was more qualified than the others for the open positions. But read in context, Jaycox's email tells a far different story. The email Hammond cites is only the last in a chain. In an earlier message, Jaycox raised concerns about Hammond's leadership engagement and recommended ways for Hammond to improve. Once Hammond responded with some alternatives, Jaycox then indicated that Hammond was the "best person" to decide how to proceed. *Id.* As a result, no reasonable jury could understand Jaycox's email to suggest that Hammond was particularly qualified for a market VP/CFO role. A jury could conclude only that Jaycox believed that Hammond knew best how to address his performance issues.

Hammond's best argument is the one we have saved for last. Hammond posits that he was more qualified than Calabrese, Walker, and Lee because of his educational background. To his credit, Hammond earned a bachelor's degree and a master's in business administration. And

indeed, one of the preferred qualifications for the VP/CFO positions was an MBA. But even assuming the other three candidates lacked similar degrees, this credential alone is insufficient for a reasonable jury to find that Hammond was *significantly* better qualified given the other candidates' greater work experience. *See White*, 533 F.3d at 394 (finding a genuine dispute as to pretext where the plaintiff had better educational credentials *and* more relevant experience and "was consistently rated as a high performer"); *Provenzano*, 663 F.3d at 817 (finding that plaintiff had not raised a genuine dispute despite "superior educational credentials" when the promoted individual "had a much stronger performance record").

**b.**

Next, Hammond appears to argue that Sysco was not motivated by objective qualifications but by its "culture of discrimination." Appellant's Br. 26, 29. As evidence of Sysco's allegedly discriminatory culture, Hammond points out that before 2019, the company had never promoted a Black person to a market-level VP/CFO or operating company president position. The district court rejected Hammond's argument, and Sysco requests that we do too.

This Court (albeit in an unpublished opinion) resolved essentially the same issue in *Hawkins v. Memphis Light Gas & Water*. In that case, Hawkins contended that his employer had a "culture of discrimination." 520 F. App'x 316, 322 (6th Cir. 2013). To support his claim, Hawkins cited testimony that his employer had not promoted a Black person to an upper-level position in nearly forty years. *See id.* Nevertheless, we held that Hawkins's evidence was not enough to create a genuine issue of material fact. *Id.* In our view, he "confuse[d] evidence of discriminatory treatment with a claim of disparate impact." *Id.* And claims of disparate impact require a statistical analysis outlining the "number of qualified African-Americans who allegedly applied for positions," which Hawkins failed to provide. *See id.*

We reject Hammond's argument for the same reasons. Like Hawkins, Hammond effectively raises a disparate impact claim by contending that he faced a "culture of discrimination." And he too fails to provide the required statistics regarding qualified minorities' application history. He contends only that Sysco never promoted a Black person to an upper-level position until 2019. But that is not enough for a factfinder to assess whether Sysco's decision was motivated by bias. *See id.* (citing, among other cases, *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437–38 (6th Cir. 2002); *Hopkins v. Canton City Board of Education*, 477 F. App'x 349, 358–59 (6th Cir. 2012)). Hammond's argument therefore fails to show pretext.

**c.**

Finally, Hammond points to precedent. He compares his case to *White v. Baxter Healthcare Corp.* and *Risch v. Royal Oak Police Department*. In both *White* and *Risch*—two failure-to-promote cases—we reversed the district court's ruling that there was no genuine dispute of material fact as to pretext. *White*, 533 F.3d at 390–95; *Risch*, 581 F.3d 383, 391–94 (6th Cir. 2009). The district court determined that neither case was on point. So do we.

Though Hammond argues to the contrary, his case is distinguishable. To start, unlike the plaintiff in *White*, we are hard-pressed to say Hammond possessed sufficient superior qualifications to raise an issue of fact. At best, Hammond had better educational credentials. *White*, however, involved a plaintiff with better educational credentials *and* several additional years of relevant experience. *See White*, 533 F.3d at 394. Hammond's comparison to *Risch* proves similarly unconvincing. There, we found a genuine issue of fact because Risch had shown "arguably superior qualifications" *and* produced other probative evidence of discrimination. *Risch*, 581 F.3d at 385, 391–94. As to the latter, Risch submitted a lengthy record of derogatory statements made about her and her protected class by individuals in her workplace. *Id.* at 392–93.

She also produced evidence of a general atmosphere of discrimination. *Id.* at 393–94. Hammond's record, however, does not show the same. Despite his argument that Sysco possessed a pervasive culture of prejudice, Hammond concedes that he "was not subjected to any disparaging racial remarks." Hammond Resp. to Facts, R.93-1 at PageID 671. For these reasons, neither *White* nor *Risch* requires us to reach a different outcome.

**B.     Retaliation Claims**

That leaves Hammond's two retaliation claims. Specifically, he contends that after complaining of race discrimination in March 2019 and June 2020, Sysco retaliated against him by (1) first placing him on a performance improvement plan[1] and (2) later ending his employment. Like his discrimination claims, Hammond asserts that the district court overlooked genuine disputes of material fact.

Hammond's retaliation claims, which he bases on circumstantial evidence, are governed by the same three-step framework we applied while evaluating his discrimination claims. *See Chen*, 580 F.3d at 402. The district court concluded that Hammond's claims failed at the first and third steps. Having reviewed that determination de novo, we agree.

**1.     Performance Improvement Plan**

We start with Hammond's claim that Sysco retaliated against him by placing him on a performance improvement plan. To establish a prima facie case, Hammond must show that: (1) he

---

[1] Though Sysco argues that Hammond waived any appeal of a retaliation claim based on the performance improvement plan, we are unpersuaded. Sysco faults Hammond for not mentioning it in his issues presented. True, the phrase "performance improvement plan" does not appear in that section of Hammond's opening brief. Nevertheless, we read the related claim to be encompassed within Hammond's allegation that he was "Retaliated Against *and* Terminated." *See* Appellant's Br. 7 (emphasis added). After all, the use of "and" suggests that Hammond raises two issues. Further, Sysco correctly concedes that Hammond mentions the performance improvement plan elsewhere in his brief. Accordingly, we review the district court's ruling on both claims.

engaged in a protected activity; (2) Sysco knew of that protected conduct; (3) Sysco subsequently made an adverse employment action against him; and (4) the adverse action was causally related to his protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). As Sysco persuasively argues, Hammond has not demonstrated the third element. An "adverse employment action" requires a significant change in employment status. *White*, 533 F.3d at 402. Such a change usually comes in the form of a termination, reassignment with different responsibilities, failure to promote, or significant change in benefits. *Id.* But Hammond's performance improvement plan did not result in any of those things. Hammond concedes that the plan did not change his "pay," "benefits," or "job duties." Hammond Resp. to Facts, R.93-1 at PageID 668. Further, Hammond has not directed us to any other evidence suggesting that this plan was otherwise materially adverse. This retaliation claim thus fails.

## 2. Termination

Hammond's retaliation claim based on his termination makes it a little further. All agree, including the district court, that Hammond presents a prima facie case. So, we focus instead on the second and third steps.

### a.

Sysco presents a legitimate, non-discriminatory reason for Hammond's termination. Sysco explains with ample record support that it chose to terminate Hammond as part of a corporate reorganization and reduction in force because he ranked the lowest of the company's revenue management directors. As our precedent confirms, that is enough to shift the burden back to Hammond to show pretext. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012) (determining that an employer presented a non-discriminatory reason for termination where

it provided evidence that it terminated the plaintiff as part of a reduction in force due to poor job performance).

**b.**

But Hammond, again, fails to carry his burden. He attempts to show pretext through four pieces of evidence. None raises a genuine issue of material fact.

Hammond first presents a data report suggesting that his market outperformed the others in May 2020. In theory, that evidence could tend to show that Hammond was not the worst-performing revenue management director at the time of his termination. One problem: the financial metrics that Hammond cites were irrelevant to Sysco's ranking criteria. Sysco instead considered performance reviews, talent reviews, and leadership assessments. Hammond thus has not presented evidence for a reasonable jury to conclude that Sysco's reason lacks a basis in fact.

As for his remaining three pieces of evidence, Hammond shifts gears. He now attempts to show that Sysco's termination decision was actually motivated by a larger plot for retaliation. To demonstrate that point, he discusses: (1) the timing of his negative performance reviews; (2) the timing of his termination; and (3) Becca Abbate's 2018 email. But no reasonable jury could consider any of that evidence as suspicious as Hammond makes it out to be.

Consider first the timing of Hammond's negative performance reviews. He contends that they did not occur until *after* his March 2019 complaints of discrimination. The undisputed facts, however, show that Hammond's supervisor began receiving reports complaining about Hammond's leadership by the end of 2017. Indeed, his supervisor discussed those reports with Hammond during the following mid-year review.

Now turn to the timing of Hammond's termination. Hammond claims it suspiciously occurred only two months after he sent an email to Sysco's CEO that criticized the company's

approach to diversity and inclusion. Hammond is correct about the timeline. Nevertheless, he overlooks other undisputed evidence that extinguishes any potential inference of pretext. Notably, the record suggests that Sysco selected Hammond for termination in May 2020—one month before his June email.

Finally, consider Abbate's 2018 email. Hammond asserts that it demonstrates Sysco's plan to move him out of the company for raising discrimination concerns. But no reasonable jury could read the email that way. In the email, Abbate states that she wanted to discuss her "recommendation of moving [Hammond] out of the company." Abbate Email, R.93-3 at PageID 738. But Abbate does not purport to base that recommendation on Hammond's concerns about discrimination. And, at that point, she couldn't. Hammond did not formally complain of discrimination to the company for another year.

Therefore, the district court did not err in concluding that Hammond failed to demonstrate pretext for this retaliation claim.

## C.     Hammond's General Counterargument

Besides the counterarguments we have addressed throughout this opinion, Hammond raises one more that broadly applies to all his claims. Specifically, he consistently accuses the district court of making credibility determinations and weighing the evidence presented. Appellant's Br. 24–29, 35–36. But what Hammond calls "credibility determinations" and the "weighing of evidence" was really the district court assessing—using undisputed facts—whether Hammond met the requisite burden of proof for each claim. *Cf. Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010).

One example sufficiently illustrates the point. Hammond contends that the district court impermissibly weighed the evidence by concluding that his market data was "not enough" to show

pretext for his discrimination claims. But here is what actually happened: The district court first acknowledged that the data "must be viewed in the light most favorable" to Hammond. Order Granting Summ. J., R.100 at PageID 922. It then proceeded to explain why, in light of a different candidate's better work experience, Hammond's market data alone did not show that he was a "plainly superior" candidate. *Id.* at 922–23. We see no error in that approach, which the court applied throughout its opinion. As a result, this argument does not require reversal.

## IV. CONCLUSION

For all the above reasons, the district court did not err in granting Sysco's motion for summary judgment. We **AFFIRM**.