RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAWN HAYES,

*Plaintiff-Appellant*,

*v.*

CLARIANT PLASTICS & COATINGS USA, INC.,

*Defendant-Appellee*.

No. 24-1336

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00488—Janet T. Neff, District Judge.

Argued:  March 20, 2025

Decided and Filed:  July 18, 2025

Before:  GIBBONS, LARSEN, and MURPHY, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Christopher K. Cooke, SECREST WARDLE, Grand Rapids, Michigan, Matthew T. Nicols, SECREST WARDLE, Troy, Michigan, for Appellant.  Joshua P. Lushnat, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC, Birmingham, Michigan, for Appellee. **ON BRIEF:**  Christopher K. Cooke, SECREST WARDLE, Grand Rapids, Michigan, Matthew T. Nicols, SECREST WARDLE, Troy, Michigan, for Appellant.  Joshua P. Lushnat, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC, Birmingham, Michigan, for Appellee.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   After 25 years of employment, Clariant Plastics & Coatings USA, Inc. fired Dawn Hayes from her job as a warehouse logistics clerk. The company claims that she was laid off as part of a workforce reduction program; Hayes argues that she was terminated because of her gender and age.   Hayes sued in federal court, asserting claims for discrimination, unequal pay, and hostile work environment.   The district court granted summary judgment for Clariant on all claims.

While we agree that Clariant is entitled to summary judgment on the age discrimination and hostile work environment claims, Hayes has presented a genuine issue of material fact on her gender discrimination and unequal pay claims.   Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with our opinion.

I.

*Hayes's employment history.*   Dawn Hayes, a woman, was born in 1965.   In 1993, Clariant[1] hired Hayes for a position as a warehouse logistics clerk.   Hayes continued to work for Clariant until her termination in 2018.   During her 25-year career with Clariant, Hayes had a near perfect attendance record and consistently received positive reviews.

As a logistics clerk, Hayes worked in the company's shipping department, where she was responsible for production reporting, material picks, shipping paperwork, and certificates of analysis.   Although Hayes worked in the warehouse, her job was mainly clerical.

In 2015, Clariant promoted Hayes to senior logistics clerk.   Her job duties largely remained the same, though she had to learn other functions, like handling materials by operating a forklift.   Hayes also obtained a forklift license, but she later let it lapse because she was never asked to use a forklift or to renew the license.

——————————

[1]At the time, the company was called "Sandoz Chemical."   In 2015, Sandoz spun off the unit that employed Hayes to become Clariant.

In 2017, Clariant announced that it would adopt a new computer software system, SAP. In February and March 2017, Hayes, along with other warehouse employees, attended SAP training in West Chicago. After Clariant implemented the software, the company hired a temp to take over the production reporting duties that formerly fell to Hayes.

Clariant also created a new warehouse position, "warehouse coordinator," to handle the extra computer work from the new software. The company moved Chris Perjesi, a production manager, to fill the position and finalized his role in October 2017.

In February 2018, about a year after implementing SAP, Clariant implemented a workforce reduction program, intended to return the company "to pre-SAP cost levels." DE 94-11, WRP Slides, Page ID 1105. The program included a voluntary and involuntary phase. If not enough employees chose to voluntarily leave, the remaining employees would be laid off in the following order: temporary employees, employees with poor performance or absenteeism records, volunteers, and then full-time employees. Full-time, hourly employees would be considered in light of their "skill and ability" to perform "available work in an effective, efficient and safe manner." DE 94-13, WRP, Page ID 1131. If the employees' skills and abilities are equal, the company then considers their "[l]ength of service" with the company.[2] *Id.*

Albion plant manager, Joe Toma, decided that the warehouse department should be reduced. At the time, the department included Hayes (senior logistics clerk), Perjesi (warehouse coordinator), and Brian Duffey, Matt Bradley, and Kyle Dake (material handlers). (Among those five employees, Hayes was the only woman. Because no one from the warehouse department chose to voluntarily leave, the company determined that one warehouse employee would be fired.

In late February 2018, regional HR partner, Erin Xenos, emailed a list of employees pre-selected for termination to manufacturing director, Bob Anderson. Hayes was one of the employees on the list. The next day, Xenos emailed Anderson again, expressing her "concerns with our list that still need to be resolved." DE 57-7, HR Emails, Page ID 413–14. As for Hayes's selection, Xenos noted that Hayes's coworker "Chris Perjesi has less seniority so we

---

[2]One exception is when seniority considerations would threaten employee safety or efficiency.

need to exhibit the skill/performance issue with Dawn." *Id.* at 414. Xenos reiterated her concern a day later, noting Hayes's seniority and asking whether the company should perform a skills assessment.

Anderson and Toma then met to discuss the impending reduction. Anderson told Toma to perform a "comparative analysis" of the warehouse employees' skills. DE 93-3, Anderson Dep., Page ID 793. Anderson also told Toma that Hayes had a "rough time" during the West Chicago training and that she was "not all the way up on SAP where we thought she should have been, so . . . evaluate there." DE 95-4, Toma Dep. Cont., Page ID 1303.

Meanwhile, on March 3, 2018, Hayes's direct supervisor, Brad Miller, completed performance reviews of all the warehouse employees. In Hayes's performance review, Miller gave her a score of 39—tied for highest in her department.

A few days later, on March 7, Xenos finalized Hayes's severance agreement. Xenos emailed HR partner, Sue Moran, the agreement, which was approved by Anderson. A few minutes later, Toma emailed Anderson the performance evaluations, completed by Miller, along with his rating sheet. On the rating sheet, Toma gave Hayes the lowest score on her team. Anderson forwarded the rating sheet to Xenos the next day. On March 9, Clariant fired Hayes.

*Allegations of sexual harassment.* Hayes alleges that during her tenure at Clariant, she experienced constant sexual harassment. As Hayes testified, male employees routinely stared at her, made sexual advances, and openly discussed her female body parts when she was around. Several times, when Hayes arrived at work, she found a "present" on her desk or chair—for example, "a dildo gift set" or "a cucumber with a condom or a finger rubber." DE 94-16, Hayes Notes, Page ID 1144. Hayes also testified that Clariant management took part in the harassment. During the SAP training in West Chicago, warehouse manager, Brian Pierce, followed Hayes to the bar and told her that she should have sex with another male employee. He later sent Hayes an instant message to "[c]um see me." *Id.* at 1143; DE 93-2, Hayes Dep., Page ID 773. Although Hayes reported some instances of sexual harassment, Clariant apparently did not act to address her complaints.

*Procedural history.*  A few months after her termination, Hayes filed a charge with the EEOC, alleging gender and age discrimination under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA) of 1967 and a violation of the Equal Pay Act (EPA).  The EEOC eventually issued a "right to sue" letter.

Hayes then sued in federal court, asserting claims for discrimination under federal and state law, unequal pay under the EPA, and hostile work environment.[3]  Clariant moved for summary judgment, which the district court granted.  Hayes moved for reconsideration, but the district court denied the motion.

## II.

We review a district court's grant of summary judgment de novo.  *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).  Summary judgment is warranted when the record, viewed in the light most favorable to the non-moving party, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Id.* (quoting Fed. R. Civ. P. 56(a)).

## III.

Hayes asserts age and gender discrimination claims under Title VII and the ADEA. Because Hayes relies on indirect evidence, we apply the three-step *McDonnell Douglas* burden-shifting framework.  *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under that framework, Hayes must first make out a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If she meets this requirement, Clariant must articulate "some legitimate, nondiscriminatory reason" for its employment decision.  *Id.*  Finally, if Clariant offers such an explanation, Hayes "must point out evidence from which a jury could reasonably reject [Clariant's] explanation" as pretextual. *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (quotation omitted).

---

[3]Hayes also asserted a retaliation claim, but she later withdrew it.

A.

To establish a prima facie case of age discrimination, Hayes must show that: (1) she was a member of a protected class, (2) she was discharged, (3) she was qualified for the position held, and (4) she was replaced by someone outside her protected class or treated less favorably than a similarly situated employee outside her protected class. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

Hayes's age discrimination claim fails because she cannot meet the fourth element. Because Hayes does not argue that she was replaced by someone substantially younger, she must show that she was treated less favorably than a similarly situated employee who was under the age of 40. *See Grosjean*, 349 F.3d 332 at 335 (defining the protected class as employees "at least 40 years old"). Although Perjesi was a similarly situated employee, he was 46 years old when Hayes was fired and thus a member of the protected class. Only one warehouse employee, Dake, was under the age of 40 when Hayes was fired. But Hayes does not argue that Dake was similarly situated for purposes of her age discrimination claim. Although Hayes mentions Dake in other portions of her brief, she does not assert that he is a proper comparator or otherwise develop such an argument. And this court need not consider such a hypothetical argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The district court did not err in granting summary judgment on Hayes's age discrimination claim.

B.

To make out a prima facie case of gender discrimination, Hayes must show that: (1) she is a woman, (2) she suffered an adverse employment action, (3) she was qualified for the employment position, and (4) she was treated less favorably than similarly situated male employee or was replaced by a male employee. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). The first three elements are met: Hayes is a woman, she has put forward evidence that she was qualified for her job and performed it competently since 1993, and she was

fired.  The dispute centers on the fourth element: whether Hayes was treated less favorably than a similarly situated male employee.**4**

1.

The district court determined that Perjesi was not similarly situated with Hayes because "he had production experience, a forklift license, and supervisory skills."  DE 98, District Ct. Op., Page ID 1651.  These differences, the district court reasoned, show that "Perjesi was able to perform all required job functions while [Hayes] was not."  *Id.*  Yet a plaintiff need not show an "exact correlation" with the employee who received favorable treatment to be considered similarly situated.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  The plaintiff need only show that the two are "similar in all of the *relevant* aspects."  *Id.* (quotation omitted).  Otherwise, if the non-protected employee to whom the plaintiff compares herself must be "identically situated to the plaintiff in every aspect of their employment, a plaintiff whose job responsibilities are unique" to her position will never establish a prima facie case in the absence of direct evidence of discrimination.  *Id.* at 353; *see Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003).

The district court did not explain why Perjesi's production experience, forklift license, or supervisory skills were relevant to the similarly situated analysis.  *See Ercegovich*, 154 F.3d at 352 ("Courts . . . should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.").  Both Hayes and Perjesi held non-managerial warehouse jobs that did not require production or management skills.  Clariant argues that Perjesi's experience as a production manager made him versatile and thus more valuable to the company.  But Perjesi was demoted from his production manager job and placed on a performance improvement plan.  As a production manager, Perjesi's "presence and visibility to provide direction on the production floor [was] limited."  DE 95-11, Perjesi PIP, Page ID 1432.  Often, he could not even be found.  He also struggled to recognize safety hazards.  For example, on one occasion, Perjesi started yelling at an employee who was driving a forklift to the point that the employee was "willing to quit his job."  *Id.* at

---

**4**Hayes does not argue that she was replaced by a male employee.

1434. Although Perjesi claimed that the employee was misusing the forklift, Perjesi's supervisor disagreed, noting that the incident was "another example of [Perjesi's] lack of knowledge on the [s]afety rules and his lack of leadership." *Id.* at 1434. Thus, considering Perjesi's performance in this role, there is sufficient evidence for a reasonable jury to find that his production management experience does not set him apart from Hayes.

The district court also emphasized that Perjesi had a forklift license, while Hayes did not. It is true that, when Hayes was terminated, she did not have a forklift license while Perjesi had a license and used a forklift about once a month. But to conclude that Hayes and Perjesi were not similarly situated because Hayes lacked a forklift license would be to require an "exact correlation" between the employees that this court has repeatedly rejected. *Ercegovich*, 154 F.3d at 352. Relevant factors in determining whether an employee is similarly situated cannot be based on "narrow job functions." *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008). This is especially so when the "number of employees with whom [Hayes] could be compared for purposes of establishing a comparable is relatively small." *Id.* Only six employees worked in the Albion warehouse—a manager, three materials handlers, and two office workers. The only other non-manager employee who worked in the office besides Hayes was Perjesi.

In any event, Hayes had previously obtained a forklift license. She eventually let it lapse because the company did not ask her to renew it. Thus, the evidence, viewed in the light most favorable to Hayes, shows that she *could* operate a forklift, though the company apparently did not require her to operate one. In light of these facts, a reasonable jury could find that the presence of a forklift license was not a materially distinct difference between Perjesi and Hayes.

Clariant also emphasizes Perjesi's "superior" SAP skills. But the record does not conclusively establish that Perjesi had superior skills. In Hayes's performance evaluation, Miller noted that Hayes "needs to learn the inbound side of SAP" and to "comprehend all aspects of the SAP world *as we all do*." DE 94-21, Hayes Perform. Eval., Page ID 1228 (emphasis added). As for Perjesi, Miller found that he, too, "needs further training on some Inbound receiving and troubleshooting shipping picks." DE 94-24, Perjesi Perform. Eval., Page ID 1251. Thus, a reasonable juror considering the evidence, including the performance evaluations, could find that Hayes's SAP skills were on par with Perjesi's.

But even if Perjesi had superior SAP skills, this distinction does not necessarily make him an improper comparator. *See Ercegovich*, 154 F.3d at 352 (rejecting comparative analysis between employees on "every single aspect of their employment"). For one, Hayes received a higher overall score on her performance evaluation than Perjesi. Clariant argues that the performance reviews were irrelevant to the company's workforce reduction. The more relevant analysis, according to Clariant, involved a comparison of the employees' skills based on the needs of the warehouse. Yet many skills assessed in the performance evaluation and rating sheet were the same. For example, the performance evaluations included a section for "teamwork," which asked whether the employee was a "team player"; the rating sheet included a category for "interpersonal skills" to evaluate the employee's "ability to interact and function effectively on a team." *E.g.*, DE 94-21, Hayes Perform. Eval., Page ID 1224–28; DE 94-12, Rating Sheet, Page ID 1126. In her teamwork section, Miller said Hayes "works well with others in the department"; but on the rating sheet, Toma rated Hayes's interpersonal skills a 1 (poor). DE 94-21, Hayes Perform. Eval., Page ID 1227; *see* DE 94-12, Rating Sheet, Page ID 1126–27. Thus, assuming Perjesi had better SAP skills, and those skills were needed in the warehouse, a reasonable jury could find that Hayes had several other in-demand skills.

If Perjesi's production experience, forklift license, and SAP skills do not, as a matter of law, set him apart from Hayes, the question becomes whether the two employees were similarly situated in the truly "relevant" aspects of their employment. *Ercegovich*, 154 F.3d at 352. We think a reasonable jury could conclude that they were.

To start, Hayes and Perjesi had similar job duties. They were both warehouse employees tasked with handling inbound and outbound material orders, shipping and receiving functions, processing purchase orders, and printing labels, with Hayes handling the outbound orders, and Perjesi handling the inbound orders. Their warehouse positions were part of the same "Job Family," which was called "PT 2 – Site management & production services." DE 94-9, Senior Log. Clerk Desc., Page ID 1100; DE 94-10, Warehouse Coord. Desc., Page ID 1101–02. Hayes and Perjesi also reported to the same manager, Brad Miller, who was responsible for the

employee performance reviews. And they were subject to the same work standards, as their identical performance evaluations and the rating sheet show.[5]

Clariant contends that whether Hayes and Perjesi had "comparable duties" is not relevant in the workforce reduction context as the company's focus was on "department needs and facility efficiencies." CA6 R. 32, Appellee Br., at 20. To be sure, Clariant's workforce reduction policy provides that, when selecting employees for layoff, the company considers the "employees' skill and ability." DE 94-13, WRP, Page ID 1131. But surely the type of work the two performed (and how well they performed it) bears some relevance to an evaluation of their comparative skills—particularly so, given the similarity between the skills evaluated in the performance evaluations and the rating sheet. *Cf. Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 524 (6th Cir. 2021) (concluding that evidence of plaintiffs' attendance and productivity was irrelevant when company fired her because of her work availability).

In sum, Hayes and Perjesi performed similar job duties, reported to the same boss, and were subject to the same standards. A reasonable jury could therefore conclude that they were similarly situated in all relevant aspects of their warehouse jobs.[6]

2.

Because Hayes was terminated as part of a workforce reduction, she must meet a heightened standard to prove her prima facie case by presenting "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out . . . for discharge for impermissible reasons." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536–37 (6th Cir. 2014) (citation omitted).

---

[5]The performance evaluations assessed employees in six areas: safety, job knowledge, attendance, productivity, initiative, and teamwork. The rating sheet also evaluated employees in six areas: decision making and problem solving, interpersonal skills, technical knowledge, planning and organizing, leadership, and analytical skills.

[6]For this reason, the district court also erred when it concluded that Hayes did not establish a prima facie case under the EPA. *See Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006); 29 U.S.C. § 206(d). The district court concluded that Hayes did not perform equal work to Perjesi because they "had different responsibilities, maintained different skillsets, and performed different tasks." DE 98, District Ct. Op., Page ID 1657. But for the reasons discussed, that was an error—a reasonable juror could conclude that the two performed equal work. The record also shows that, at the time of her termination, Hayes's rate of pay was $21.58 per hour, while Perjesi's rate was $27.00 per hour. Hayes therefore stated a prima facie equal pay case.

*Superior qualifications.*   Hayes may show that she was singled out for impermissible reasons by establishing that she had "superior qualities." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010).   To begin, Hayes had 25 years of warehouse experience.  At one point, she obtained a forklift license.  Although Hayes let her license lapse, she apparently had no reason to renew it—she did not use a forklift during her shift and the company never told her to renew her license.

Perjesi, on the other hand, had a more tumultuous employment record.  Before joining Clariant, he worked as a manager at Musashi Auto Parts but was fired after an HR investigation. Perjesi then took a job as a quality engineer at Janesville Acoustics but was placed on a performance improvement plan and fired about a year after accepting the job.

Perjesi then applied for a position with Clariant.   In his application, however, Perjesi omitted the circumstances for his departure from Musashi and Janesville Acoustics.

Clariant hired Perjesi in 2015 to work as a production manager.  Perjesi struggled in the role, however, and in 2017, Clariant placed Perjesi on a performance improvement plan. Although Perjesi showed potential in some areas, he was inaccessible to his employees and failed to recognize safety hazards.  But despite Perjesi's poor performance, he was given a second chance.  Clariant moved Perjesi into the warehouse and created a new position just for him.  Thus, at the time of the workforce reduction, Perjesi had less than a year of warehouse experience, while Hayes had 25 years.

Beyond warehouse experience, Hayes had a virtually perfect attendance record and received the highest overall score on her performance evaluation, tied with one other employee.

The evidence, viewed in the light most favorable to Hayes, including Hayes's 25-year employment history and her 2018 performance evaluation, which placed her above three male employees (including Perjesi), could lead a reasonable juror to conclude that Hayes had superior qualities.  A reasonable juror could also infer that Hayes's low scores on the rating sheet did not reflect an actual poor performance "but rather the reviewer's attempt to ensure [Hayes] was among those discharged in the workforce reduction." *Rachells v. Cingular Wireless Emp. Servs.,*

*LLC*, 732 F.3d 652, 664 (6th Cir. 2013).  Thus, Hayes presented sufficient evidence to establish a factual dispute over whether she was singled out for termination based on her gender.

*Discriminatory atmosphere.*  Hayes may also show that she was singled out by presenting evidence of a discriminatory atmosphere.  *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 392–93 (6th Cir. 2009).  Although evidence of a discriminatory atmosphere is not "conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."  *Id.* (quoting *Ercegovich*, 154 F.3d at 356).

The record, viewed in the light most favorable to Hayes, reveals a climate of pervasive sexual harassment.  During her tenure at Clariant, Hayes's male colleagues made numerous unwelcome sexual advances and remarks to her at work.  On one occasion, when Hayes entered the employee break room one day, a male employee asked her "[d]o you know what we all think when you walk into the break room[?]"  DE 94-16, Hayes Notes, Page ID 1143.  Hayes answered, perhaps facetiously, "[t]hat we are one big happy family like the Walton's."  *Id.*  The male employee responded, "No we all want to fuck you."  *Id.*  On another occasion, a male employee told Hayes that she "needed to lose weight" because her "boobs were getting too big." *Id.*  Several male employees would also "yell cockpit when [she] yawned," a gratuitous remark invoking images of oral sex.  *Id.* at 1144.

In addition to these inappropriate remarks, Hayes's male coworkers left several "present[s]" on her desk and chair.  *Id.*  These included "a dildo gift set," "a cucumber with a condom or a finger rubber," and "a bag from Victoria['s] Secret with thongs in every color."  *Id.* Many of these "gifts" came with a sexually explicit note.[7]

---

[7]The notes included:

- "Lets [sic] do the Monica thing," left along with a cigar (in reference to the Bill Clinton and Monica Lewinski scandal).

- "Dawn[,] I need hugs and kisses today or tomorrow [be]cause I'm off next week!  P.S. and this isn't Dan."

- "CANDY is dandy but sex won't [rot] your teeth."

DE 95-20, Sexual Harassment Notes, Page ID 1474–76.

The record also indicates that Clariant management knew about some of the alleged sexual harassment. For example, Hayes testified that when she "would walk through the plant," one male employee "would bend his knees, put his hands on his kneecaps, and do a 180 as I walked by." DE 93-2, Hayes Dep., Page ID 758. A quality control manager observed the male employee's behavior and asked Hayes about it. Hayes told the manager that the man was stalking her, and the manager said he would walk her back to her station. When she returned to her station, Hayes told her then-manager, Brian Pierce, about the incident and her belief that the man was stalking her. Pierce apparently did nothing: he did not ask Hayes any questions about the incident, and he never followed up with her or the male employee. Indeed, the record suggests that Pierce took part in the sexual harassment against Hayes. During the 2017 training in West Chicago, Pierce followed Hayes to the bar and told her that she should have sex with another male employee. Some time after the training, Pierce sent Hayes an instant message, asking her to "[c]um see me," a deliberate misspelling intended to be sexual. DE 94-16, Hayes Notes, Page ID 1143; *see* DE 93-2, Hayes Dep., Page ID 771, 773. On another occasion, Pierce offered Hayes $10 to try on a tank top that she had laid on the back of her work chair.[8]

Clariant emphasizes that Pierce was no longer Hayes's direct supervisor when these alleged incidents occurred; he was a manager in another department. Yet evidence of a discriminatory atmosphere "is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." *Ercegovich*, 154 F.3d at 356 (quotation omitted). In many cases, "the conduct of a nondecisionmaker may be probative of whether an adverse action directed at a plaintiff" was motivated by impermissible reasons. *Rachells*, 732 F.3d at 665. In determining whether such conduct could be probative, the court instead considers factors such as the individual's position in the employer's hierarchy, the purpose and content of the conduct, and the temporal connection between the conduct and the challenged employment action. *Id.*

Although Pierce did not have direct supervision over the warehouse employees, he previously served as a warehouse manager and still held a manager position in a different department. Pierce even testified that after leaving the warehouse, the employees still sought

---

[8]Pierce, for his part, denies all three incidents.

him out at times.  Pierce's alleged conduct—ignoring a report of sexual harassment made by a female employee and then making several sexually suggestive remarks to that same female employee—is also probative of a discriminatory atmosphere.  *See Risch*, 581 F.3d at 393 ("Discriminatory statements made by individuals occupying managerial positions can be particularly probative of a discriminatory workplace culture.").  Lastly, the incidents involving Pierce in early 2017 are not so temporally remote from the workforce reductions in March 2018 as to diminish entirely their probative value.  *See Rachells*, 732 F.3d at 667 (concluding that evidence of a discriminatory atmosphere "is not rendered irrelevant simply because those events predated" the workforce reduction "by a year and a half").

Considering evidence of several instances of sexual harassment directed at Hayes by male coworkers, including a former manager, as well as evidence that Hayes had superior qualifications to other male employees retained during the workforce reduction, Hayes has provided "additional" evidence that she was terminated on account of her gender, as required by the heightened standard for workforce reduction cases.  *Pierson*, 749 F.3d at 536–37.  Because Hayes established a prima facie case of gender discrimination, the district court erred in granting summary judgment on the claim.

C.

Because Hayes has established a prima facie case of gender discrimination, the burden now shifts to Clariant to proffer a legitimate, nondiscriminatory reason for firing Hayes.  *See McDonnell Douglas*, 411 U.S. at 802.  Clariant easily meets its burden, as no one disputes that it has provided such a reason:  the workforce reduction and Hayes's low score on the rating sheet.

The burden thus shifts back to Hayes to point to evidence from which a jury could reasonably reject Clariant's explanation as pretextual.  *Davis*, 717 F.3d at 491.  Because the district court determined that Hayes failed to establish a prima facie case of discrimination, it declined to consider whether Clariant's proffered reason for firing her was pretextual.  Ordinarily, this court will not address an issue not passed upon by the district court.  *Freed v. Thomas*, 976 F.3d 729, 741 (6th Cir. 2020).  The proper course in such a case is to remand to allow the district court to consider the issue in the first instance.  *See id.*

Nonetheless, this court has discretion to decide an issue that was not addressed by the district court.  *See Lindsay v. Yates*, 498 F.3d 434, 440–41 (6th Cir. 2007).  Doing so is particularly appropriate when both parties have briefed the issue and resolving it would promote judicial economy.  *See id.*  The parties here briefed the issue of pretext before the district court and this court.  The pretext issue is also closely related to whether Hayes met her heightened prima facie burden of showing that she was singled out for firing because of her gender.  *See Pierson*, 749 F.3d at 536–37, 539.  Resolution of the two issues in the same appeal would therefore serve the interest of judicial economy.  We therefore consider whether the workforce reduction was pretext for gender discrimination, rather than remand the issue to the district court.  *See Lindsay*, 498 F.3d at 440–41.

Hayes may establish pretext by showing that Clariant's proffered reason:  (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) could not motivate the adverse employment action.[9]  *Davis*, 717 F.3d at 491–92.  But these are not the only ways to establish pretext.  Our consideration of these three categories is simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'"  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quotation omitted).

Clariant claims that Hayes was terminated because of her inferior skill set compared with the other warehouse employees.  But the sole document in the record showing that Hayes's skills were rated inferior—the rating sheet—was not finalized until *after* Clariant had selected Hayes for termination:  Xenos sent Hayes's severance agreement to Moran at 1:06 pm on March 7, 2018, but Toma did not send his rating sheet to Anderson until 1:32 pm that day.  Thus, this evidence suggests that the company completed Hayes' severance agreement, with approval from

---

[9]Hayes may also establish pretext by showing that she was more qualified than Perjesi.  *See Risch*, 581 F.3d at 391 ("Evidence that the plaintiff was more qualified than the successful applicant can in some circumstances be sufficient to raise a genuine issue of material fact that the employer's proffered explanation is pretextual.").  For the reasons discussed, a reasonable juror could conclude that Hayes was more qualified than Perjesi.  *See supra* Part III.B.2.  Whether evidence of Hayes's superior qualifications raises a question of fact related to pretext, however, depends on whether she has presented "other probative evidence of discrimination."  *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626–27 (6th Cir. 2006).  As a result, this section focuses on whether Hayes has offered additional probative evidence of discrimination.

Anderson, *before* Toma sent Anderson the rating sheet, the purported basis for Hayes' termination.[10]

On the other hand, there is testimony indicating that Toma had communicated the decision to HR prior to finalizing the actual rating sheet. Toma was asked, "Did you consult with anyone at all about your selection of Dawn Hayes prior to announcing that to her?" He testified, "I informed Bob Anderson of my selection and Sue Moran." DE 93-6, Toma Dep., Page ID 832. He testified that he created the rating sheet document prior to Hayes's termination. *Id.* at 833. He was asked, "So would this document have been sent as an email to Anderson and Moran?" *Id.* He said, "I believe it was" and that it would have been sent prior to Hayes's termination. *Id.*

Despite the contradicting evidence regarding timing, at this stage, we must view the evidence in the light most favorable to Hayes. When we do, a reasonable juror could conclude that Clariant's proffered reason lacked a basis in fact or did not actually motivate the company's decision to fire Hayes. The district court therefore erred in granting summary judgment on Hayes's gender discrimination claim. Hayes should have been allowed to proceed to trial to allow the trier of fact to consider and determine whether it was Hayes's inferior skills that motivated Clariant's conduct, or, rather, her gender.[11]

IV.

Hayes also asserts that Clariant maintained a hostile work environment under Title VII. The district court granted summary judgment on this claim, finding that Hayes had failed to administratively exhaust the claim before the EEOC and that it was time-barred.

A plaintiff generally cannot bring Title VII claims in federal court without first exhausting her administrative remedies. *See* 42 U.S.C. § 2000e–5(e)(1). A plaintiff exhausts her

---

[10]Clariant maintains that Hayes' low score on the rating sheet was the sole basis for Hayes' termination.

[11]Hayes need not show pretext to prevail on her EPA claim. *See Beck-Wilson*, 441 F.3d at 365. Rather, the burden rests with Clariant to prove that "the factor of sex provide[d] *no* part of the basis for the wage differential." *Id.* (quotation omitted). Clariant fails to meet this "heavy" burden, however, because a reasonable juror could conclude that Hayes's gender played a role in her lower pay. *Id.* (quotation omitted). We therefore reverse the district court's grant of summary judgment to Clariant on Hayes's EPA claim.

administrative remedies on those claims when she includes them in her EEOC charge.  *See id.* § 2000e–5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974).  If, however, the facts supporting the charged claim "would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (quotation omitted).

In her EEOC charge, Hayes did not assert a claim of hostile work environment, and she described only one discrete act of alleged discrimination—her firing in March 2018.  Yet "the inclusion in an EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a hostile-work-environment claim for purposes of exhaustion."  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010).  That is because a hostile work environment claim cannot be "reasonably expected to grow out of the charge" alleging only discrete acts of discrimination. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quotation omitted); *see Younis*, 610 F.3d at 362.

Hayes argues that the two letters she sent to the EEOC after filing her initial charge effectively amended the charge, placing Clariant on notice of her hostile work environment claim.  In her first letter, submitted about a month after her EEOC charge, Hayes alleges that she faced "frequent harassment and a hostile work environment" at Clariant.  DE 94-15, First EEOC Ltr., Page ID 1140.  She then describes several instances of alleged harassment.  In her second letter, submitted about five months later, Hayes again recounts several instances of sexual harassment, including inappropriate comments made by male colleagues "on a daily/weekly/monthly basis."  DE 95-10, Second EEOC Ltr., Page ID 1428.  She alleges that "[t]his behavior created a[] hostile work environment" at Clariant.  *Id.*

The parties debate whether a post-charge letter can amend an EEOC charge for purposes of exhaustion.  This circuit has yet to address the issue, though some of our sister circuits have concluded that a post-charge letter does not amend the EEOC charge.  *See, e.g.*, *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) ("[I]t would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges . . . is to put the charged party on notice."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (holding that

unsworn letter could not be viewed as expanding scope of EEOC charge to encompass new unlawful practices), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Cheek v. W. & S. Life Ins.*, 31 F.3d 497, 502–03 (7th Cir. 1994) (same).  At least one district court in this circuit has found that a post-charge email (albeit one sent the same day) amended the EEOC charge to include a gender discrimination claim, even though the initial EEOC charge only alleged race discrimination.  *Bazzi v. Y.P. Advert. & Publ'g.*, LLC, No. 15-10741, 2016 WL 4493676, at *6 (E.D. Mich., Aug. 26, 2016).  We need not resolve the issue here, however, because Hayes's hostile work environment claim is time-barred.

A Title VII plaintiff who first initiated proceedings with a state or local agency must file her EEOC charge within 300 days of the alleged incident.  *See* 42 U.S.C. § 2000e–5(e).  The parties agree that this limitations period applied to Hayes.  She filed her charge on May 3, 2018, so any claim based on conduct that occurred before July 7, 2017 is untimely.  In her deposition, Hayes testified that all the incidents of sexual harassment occurred before Pierce retired, which was on June 30, 2017.  Thus, based on the initial EEOC charge, Hayes's claims are time-barred.

If, however, Hayes's post-charge letters expanded the scope of her initial EEOC charge to include a claim for hostile work environment, Hayes's claims may be timely under the "continuing violation" doctrine.  Under that doctrine, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see Alexander v. Loc. 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408 (6th Cir. 1999).

Hayes claims that the last actionable act was her termination on March 9, 2018, which is within the 300-day filing period.  The problem is that Hayes did not allege—in either her EEOC charge (or post-charge letters) or federal complaint—that her *termination* was part of the hostile work environment that she experienced.

Thus, because the most recent incident of sexual harassment alleged by Hayes occurred before June 30, 2017, more than 300 days before she filed her EEOC charge, Hayes's hostile work environment claim is time-barred.

V.

Hayes also appeals the dismissal of her state-law claims. After rejecting Hayes's federal claims, the district court declined to exercise supplemental jurisdiction over these state-law claims and dismissed them without prejudice. *See* 28 U.S.C. § 1367(c)(3). Because the district court erred in granting summary judgment on some of Hayes's federal claims, we remand so that the district court can reconsider its supplemental jurisdiction decision. *See Gambrel v. Knox Cnty.*, 25 F.4th 391, 412 (6th Cir. 2022); *cf. Rudd v. City of Norton Shores*, No. 22-1229, 2023 WL 3886404, at *10 (6th Cir. June 8, 2023) (declining to reverse discretionary dismissal of remaining state-law claim without prejudice after affirming dismissal of First Amendment claim).

VI.

Hayes is entitled to a trial on her gender discrimination and equal pay claims. But we agree with the district court that Clariant is entitled to summary judgment on Hayes's age discrimination and hostile work environment claims. For these reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.